LAWYERS TITLE INSURANCE COR-
PORATION, a Virginia corporation,
Plaintiff–Appellee,

v.

HONOLULU FEDERAL SAVINGS AND
LOAN ASSOCIATION, a federal sav-
ings and loan association, Defendant–
Appellant.

No. 88–15155.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 1989.

Decided Jan. 11, 1990.

As Amended April 10, 1990.

H. William Burgess, Honolulu, Hawaii,
for defendant-appellant.

James T. Paul, Honolulu, Hawaii, for
plaintiff-appellee.

Before CHOY, CANBY and NORRIS,
Circuit Judges.

## ORDER

Lawyers Title Insurance Corporation
(Lawyers Title) has made a motion to clari-
fy the opinion filed January 11, 1990, slip
op. at 387 (9th Cir. Jan. 11, 1990), appear-
ing in the advance sheets at 893 F.2d 1084
(9th Cir.1990). Lawyers Title asserts that
the opinion precludes it from litigating is-
sues of coverage that have not yet been
litigated. Honolulu Federal Savings and
Loan Association (Honfed) opposes Law-
yers Title's motion for various reasons.

Apparently part one of this bifurcated
case had a narrower focus than we be-
lieved. Part one was to resolve only one of
the possible legal arguments for precluding
Honfed from recovering the losses it suf-
fered as a consequence of the mechanic's
lien claims. Specifically, it was to deter-
mine whether there was an insurable loss
under the policy. Part two would resolve
any remaining issues, including other cov-
erage issues.

Neither party provided a copy of the bifurcation order in its excerpts of record on appeal to this court. We thus relied on the district court's findings of fact and conclusions of law from part one of the case, the summary judgment order from part two, and the parties' briefs in determining what had been litigated. The summary judgment order stated that the "case was bifurcated so that the court could decide the issue of coverage separately from the issues of indemnification and bad faith."

Our understanding, then, was that part one of the case had involved all the coverage issues despite the fact that the district court only relied on one theory to hold that there was no coverage. This seemed an efficient way to bifurcate the trial, and the district court's findings in part one sufficed to determine that there was no coverage. The briefs made no mention of the fact that bifurcation was partly intended to allow Lawyers Title to proceed with the same counsel at least through the first stage of the proceedings, as Lawyers Title now argues.

Indeed, the parties' briefs reinforced our understanding of what had been litigated. Honfed asked us to reverse both district court orders and to instruct the district court to enter judgment in its favor and allow it to proceed on its counterclaims. Lawyers Title misled us further. It argued at length and with repeated reference to the record that Honfed's conduct amounted to a breach of the insurance agreement and thus Lawyers Title should not be obligated to cover the claims in question.

Lawyers Title now insists that it only made "casual reference" to Honfed's conduct in order to provide this court with another reason to affirm the district court's ruling in part one. Only now, after we refused to use this alternative ground to affirm the district court's ruling, does Lawyers Title assert that issues relating to the conduct of the parties were never litigated in the district court.

It is important that counsel for the parties provide us, as an appellate court, guidance with respect to what transpired in the proceedings below. To mislead the court—either intentionally or negligently—is inappropriate.

Nevertheless, in the interests of issuing an opinion consistent with our appellate jurisdiction and of allowing the parties full and fair opportunity to raise their claims, we grant Lawyers Title's motion to clarify our opinion and amend our opinion as follows:

(1) On page 390, paragraph one of the slip opinion, delete all but the first sentence and then add: "A magistrate bifurcated the case, with part one focusing on whether Honfed suffered an insurable loss, and part two on any remaining claims. Because we find that the district court wrongly decided the issue in part one, we reverse both orders below and remand for further trial."

(2) On page 392, third paragraph, delete the last sentence and replace with: "A magistrate bifurcated the trial so that the district court could determine whether there was an insurable loss separately from all other issues."

(3) On pages 396–398, delete everything after the third paragraph on page 396 and replace with the following:

"We therefore hold that there is also no longer a triable issue as to whether Queen Emma's conduct created a basis for equitably estopping it from cancelling the leases: it did not. When the record supports only one resolution of a factual issue, or in this case a mixed question of law and fact, we can order the lower court to enter judgment on that issue. *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), citing *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 331–332, 95 S.Ct. 472, 479–480, 42 L.Ed.2d 498 (1974).

The summary judgment ordered in part two of the case below relied on the finding that there was no coverage because there was no insurable loss. We reverse the summary judgment ruling because we have determined that there was an insurable loss.

CONCLUSION

We REVERSE both orders below and REMAND for further proceedings."

OPINION

CHOY, Circuit Judge:

This case involves a dispute over the coverage of a title insurance policy Lawyers Title Insurance Corporation (Lawyers Title) issued to Honolulu Federal Savings and Loan Association (Honfed). A magistrate bifurcated the case, with part one focusing on whether Honfed suffered an insurable loss, and part two on any remaining claims. Because we find that the district court wrongly decided the issue in part one, we reverse both orders below and remand for further trial.

BACKGROUND

In July, 1982, Honfed loaned $17,000,000 to two corporations controlled by developer Donald Look. Look obtained this loan to refinance his existing mortgage loans on the Bougainville Industrial Park Subdivision in Honolulu. Look secured the loan with a promissory note and two recorded mortgages covering 44 leasehold lots in the Bougainville project. The leasehold lots include 26 owned in fee by The Queen Emma Foundation, an eleemosynary foundation and a major landowner in Hawaii.

The 26 leases from Queen Emma required Look to construct on each lot a building costing at least $100,000. Any mechanic's lien resulting from construction would attach to Look's leasehold and Queen Emma's fee interest under Hawaii law. Therefore, the Queen Emma leases each contained a provision that allowed Queen Emma to cancel the lease in the event that the lessee did not clear any mechanic's lien within five days after foreclosure of the lien.

This lease provision posed an obvious threat to Honfed's security interest in its loan to Look, because cancellation would extinguish that security. In order to protect its interest, Honfed purchased an insurance policy from Lawyers Title on July 15, 1982. This standard policy contained a special provision that insured Honfed "against loss which [Honfed] shall sustain by reason of any statutory lien for labor or material which now has gained or hereafter may gain priority over the insured mortgage, or which may attach to the leasehold or fee simple interest in the property."

Look ran into financial difficulty, and in 1984 several creditors filed applications for mechanic's liens on the three lots owned by Queen Emma where construction had commenced. In August and September, Queen Emma filed complaints for summary possession and termination of the leases against Look due to nonpayment of rents. In November, Honfed, in order to protect its security and in lieu of foreclosing on the leases held by Look, took an assignment of Look's leasehold interest in all 44 lots and paid all delinquent rents. This assignment was made subject to and did not extinguish or release Honfed's insured mortgage.

In connection with this assignment, Honfed and Queen Emma executed two documents on December 31, 1984, each entitled "Lessor's Consent; Amendment of Leases; and Estoppel Certificate." In the estoppel certificate portion of the documents, Queen Emma certified to Honfed that, as of the date of the document, the leases remained in full force and effect except as modified in Exhibit A. Exhibit A referred to any existing perfected or unperfected mechanic's liens. Finally, the certificates stated that Queen Emma knew of no events that currently or with the lapse of time would authorize them to cancel the leases.

Honfed's general counsel informed Lawyers Title of the lien applications and requested that Lawyer's Title choose local counsel to defend against the liens on behalf of Honfed. Lawyers Title agreed to pay and did pay Honfed's general counsel to take up the defense.

Queen Emma subsequently tendered its defense to Honfed, which, as assignee, was obligated to protect Queen Emma under the lease agreements. Honfed agreed to defend against the liens on behalf of Queen Emma. There appears to be some dispute over whether Honfed sought and obtained approval from Lawyers Title to accept Queen Emma's tender of its defense.

At this point it became clear that Honfed and Lawyers Title had differing views about the legal significance of the estoppel certificates. Lawyers Title thought that Queen Emma had waived its rights to cancel the leases should the liens become enforceable because of the estoppel certificates. Thus, Lawyers Title and Honfed entered into an indemnity agreement whereby Honfed agreed to reimburse Lawyers Title if Lawyers Title satisfied the lien claims and subsequently a court found that the liens were not covered under Honfed's title insurance policy.

Lawyers Title settled the outstanding lien claims for a total of $367,220.00. Lawyers Title then sought a declaration that its policy did not cover the lien claims settled and that Honfed must reimburse it under the indemnity agreement. A magistrate bifurcated the trial so that the district court could determine whether there was an insurable loss separately from all other issues.

The district court in part one of the trial held that the liens did not have priority over the mortgage and that Queen Emma had waived its right to cancel the leases. As a result, the court found the lien claims did not fall within the insurance coverage provided by Lawyers Title.

In the second part of the trial, the district court relied on the ruling in part one and its own rejection of Honfed's affirmative defenses in declaring summary judgment in favor of Lawyers Title. Honfed timely appealed both orders.

## STANDARD OF REVIEW

In part one of the case, the issue of insurance coverage turned upon the legal effect of the estoppel certificates entered into by Honfed and Queen Emma. The legal effect of the certificates—that is, whether or not they effected a waiver of Queen Emma's right to cancel the leases should mechanic's liens attach to the fee, be foreclosed, and remain uncleared for five days—depended upon how the district court interpreted them.

■ When the district court's interpretation is based on an analysis of the contractual language and the principles of contract interpretation, we review de novo. When the interpretation focuses on extrinsic evidence of related facts, however, the trial court's decision is reviewed under a "clearly erroneous" standard.. *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 736 (9th Cir.1988), citing *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir.1985).

In its Conclusions of Law, the district court found the estoppel certificates to be clear and unambiguous. As a result, the court stated that it would not consider parol evidence in its ruling. The district judge went on to say, however, that even if he did perceive an ambiguity in the language of the certificate, the extrinsic evidence presented to him at trial would not have changed his interpretation because the evidence presented to show that the parties to the estoppel agreement did not intend for Queen Emma to waive any right to cancel the leases did not seem persuasive to the court in light of the "clear language of the certificates."

We review de novo the district court's primary ruling based on the unambiguous language of the certificates and the general principles of contract interpretation. We conclude that the language of the estoppel certificates and the undisputed status of the lien applications on the date the certificates were signed require a result contrary to that reached by the district court. Therefore, we need not address the district court's observations about the extrinsic evidence concerning the intended effect of the certificates.

## ANALYSIS

■ With regard to the legal effect of the estoppel certificates, the district court held:

"[B]y executing the estoppel certificates which explicitly acknowledged both perfected and unperfected mechanic's liens and nonetheless stated that Queen Emma knew of no present or impending event that could trigger its right to terminate the leases, Queen Emma waived its right to terminate the leases as a result of the mechanic's liens."

The court therefore held that the mechanic's lien claims filed against the leaseholds and Queen Emma's fee interest posed no threat to Honfed's security for the loan it made to Look, and thus fell outside the scope of coverage provided by the title insurance policy. We disagree.

The estoppel certificates did not have the effect of waiving Queen Emma's right to cancel the leases. According to the provisions of the lease, Queen Emma would be unable to cancel the lease unless and until the following events occurred: (1) a lien attached to the property; (2) a foreclosure order was entered; and (3) five days passed after entry of foreclosure without the lessee discharging or releasing the lien. On December 31, 1984, the date when the estoppel certificates were executed, none of these events had occurred. The order directing the liens to attach was not entered until May 10, 1985.

Moreover, attachment does not mean that the lien will be enforced or will come about with the simple lapse of time; action is required. Under Hawaii law, a lien will expire three months after issuance of the order directing the lien to attach unless proceedings are commenced within that time to collect the amount due. *See* HAW. REV.STAT. § 507–43(e) (1985). Hawaii law also provides for various procedures whereby interested parties will have the opportunity to intervene. The lien is only enforceable after the court enters the appropriate interlocutory order or final decree of foreclosure. HAW.REV.STAT. § 507–47 (1985).

Thus, at the time Queen Emma signed the estoppel certificates, it did not have the right to cancel the leases because of any mechanic's liens nor would it necessarily have acquired that right with the mere lapse of time. The estoppel certificates therefore did not have the effect of waiving any existing right of Queen Emma to cancel the leases because no such right existed.

Nor did the language in the estoppel certificates amount to a waiver of any future right that Queen Emma might have acquired to cancel the leases. Instead, the certificates only recited the state of the relationship between Queen Emma and the leasehold assignee Honfed as of the date Queen Emma signed the certificates. This is consistent with the general purpose of an estoppel certificate, which is to assure one or both parties to an agreement that there are no facts known to one and not the other that might affect the desirability of entering into the agreement, and to prevent the assertion of different facts at a later date. *Black's Law Dictionary*, 5th Ed. (1979).

We thus find that the district court erred when it determined that Queen Emma had waived any right it had to cancel the leases by signing the estoppel certificates. Lawyers Title also argues, however, that Queen Emma's conduct created a factual basis that justified equitably estopping it from cancelling the leases, and therefore the lien claims posed no threat to Honfed's security interest. We disagree.

One of the acts that Lawyer's Title points to in arguing for estoppel is Queen Emma's waiver of certain bonding and financing provisions contained in the leases held by Look. We need not say more about this contention than that the district court correctly rejected this argument in its Findings of Fact and Conclusions of Law.

Next, Lawyers Title alleges that Queen Emma insisted that Look commence construction on the property per the lease agreements despite the fact that it knew Look had some financial problems. Queen Emma presumably had business reasons for requiring construction on its leased property. The fact that Queen Emma expected its lessee to comply with the terms of the leases and that the lessee fell into financial difficulty when attempting to comply does not justify estopping Queen Emma from exercising its rights under the lease.

Had Look decided that he could not afford to commence construction as required under the leases, he had the option not to do so. Of course, then Queen Emma would have had justification for cancelling the leases on this basis, and Honfed would have had to intervene even earlier to protect its security. Thus, Lawyer's Title can-

not complain that Queen Emma expected Look to perform his part of the agreement.

 We therefore hold that there is also no longer a triable issue as to whether Queen Emma's conduct created a basis for equitably estopping it from cancelling the leases: *it did not.* When the record supports only one resolution of a factual issue, or in this case a mixed question of law and fact, we can order the lower court to enter judgment on that issue. *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), citing *Kelley v. Southern Pacific Co.,* 419 U.S. 318, 331–332, 95 S.Ct. 472, 479–480, 42 L.Ed.2d 498 (1974).

The summary judgment ordered in part two of the case below relied on the finding that there was no coverage because there was no insurable loss. We reverse the summary judgment ruling because we have determined that there was an insurable loss.

## CONCLUSION

We REVERSE both orders below and REMAND for further proceedings.