**Lanric HYLAND, Plaintiff–Appellant,**

**v.**

**Roy L. WONDER, Supervising Judge, Juvenile Court, Superior Court of the City and County of San Francisco, individually and in his official capacity; Daniel M. Hanlon, Presiding Judge, Superior Court of the City and County of San Francisco, individually and in his official capacity; Dennis Sweeney, Chief Probation Officer, San Francisco Juvenile Probation Department, individually and in his official capacity; Fred Jordan, Chief Probation Officer, San Francisco Juvenile Probation Department, individually and in his official capacity; Stephen La Plante, Director, Juvenile Hall, individually and in his official capacity, Defendants–Appellees.**

No. 95–15533.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 1996.

Decided June 25, 1997.

Raymond D. Battocchi, Gabeler, Battocchi & Griggs, McLean, VA, for plaintiff-appellant Lanric Hyland.

G. Scott Emblidge, Deputy City Attorney, San Francisco, CA, for defendants-appellees City and County of San Francisco, the San Francisco Superior Court, Dennis Sweeney, Fred Jordan and Stephen La Plante.

Sharon S. Chandler, Lewis, D'Amato, Brisbois & Bisgaard, San Francisco, CA, for defendants-appellees Roy L. Wonder and Daniel M. Hanlon.

Before SNEED, BOOCHEVER, and THOMPSON, Circuit Judges.

BOOCHEVER, Circuit Judge.

Lanric Hyland, a former volunteer juvenile probation worker, appeals the district court's summary judgment for defendants in his action under 42 U.S.C. § 1983, which alleged that government officials violated his First Amendment rights when they retaliated against him for his criticism of conditions and management at San Francisco's Juvenile Hall.

### FACTS

The following facts are drawn from the parties' statement of undisputed facts unless otherwise specified.

Lanric Hyland worked as a special assistant to Dennis Sweeney, the Chief Juvenile Probation Officer ("CJPO") at the Juvenile Probation Department of the City and County of San Francisco ("JPD"), from May 1987 to February 24, 1989. During the relevant time, Judge Daniel Hanlon was the presiding judge of the Superior Court, and Judge Roy Wonder was the supervising judge of the Juvenile Court. Sweeney reported directly to Judge Wonder.

Hyland was a volunteer during most of his time at the JPD. Hyland worked for pay for eight months under grants and thereafter worked without pay for fourteen months. Hyland's identification card identified him as "Special Assistant to the Chief Probation Officer." He had his own desk, phone, and keys to the Youth Guidance Center, the executive area, the probation area, and Juvenile Hall.

In June 1988, Stephen La Plante became the director of Juvenile Hall. In August, the Youth Law Center warned that it would file suit over conditions at Juvenile Hall. In October, the California Youth Authority found Juvenile Hall out of compliance with state standards. In January 1989, the California Youth Authority ("CYA") conducted two inspections of the facility and found it in poor condition, out of compliance with state law standards.

In a declaration filed in opposition to Hyland's summary judgment motion, Sweeney stated that around this time, he asked Hyland to help him draft a performance appraisal of La Plante. Hyland wrote a long draft of the performance evaluation, and rated La Plante's performance unacceptable. Sweeney did not deliver the unfavorable evaluation of La Plante to him, or take any other action.

In February 1989, the CYA notified Sweeney and Judge Wonder that Juvenile Hall did not meet minimum standards, and threatened to withdraw its certification. Hyland then decided to take matters into his own hands. Hyland wrote a long memorandum addressed to Judge Hanlon, Judge Wonder, and Judge Daniel Weinstein, the former supervising judge of the Juvenile Court. The memo detailed the problems at Juvenile Hall, documented La Plante's alleged mistakes, failures, and general incompetence to administer Juvenile Hall, and recommended that La Plante be fired.

Hyland showed the draft memorandum to Sweeney on February 24, 1989. After skimming the memorandum, Sweeney told Hyland that his relationship with the Juvenile Court was finished. Sweeney demanded Hyland's keys, and told Hyland he would issue a memorandum stating Hyland was not to be allowed back into Juvenile Hall. [ER p. 74]

Hyland decided to send the memorandum, and on February 27 he delivered the memorandum to Judges Wonder, Hanlon, and Weinstein. An addendum to the memorandum explained Hyland's reasons for disseminating it despite Sweeney's disapproval. In June 1989, the CYA withdrew its certification of Juvenile Hall because of inadequate staff training and overcrowding.

Hyland's second amended complaint further alleges the following: on March 6, 1989, Judges Wonder and Hanlon, in concert with Sweeney and La Plante, decided to fire Hyland, in retaliation for his memorandum.

The retaliation continued. On March 12, 1989, Sweeney told a newspaper reporter "Just ask Hyland why he can't be a peace officer in the state of California," an apparent reference to Hyland's 1964 felony conviction. On March 14, La Plante told a supervising counselor that "Sweeney and I will make damn sure Hyland never gets another job in corrections or juvenile justice, if we can help it." On March 20, Sweeney told a probation officer that he planned to take out a full-page ad in a national correctional association publication to tarnish Hyland's reputation. There is no evidence, however, that such an ad was published.

Hyland had been convicted of armed robbery in 1964, and after his release from prison in 1967 and his discharge from parole in 1970, he earned a graduate degree in criminal justice and obtained considerable experience in the administration of criminal justice. Before he could realize his ambition of becoming a deputy chief probation officer, however, he needed to receive a pardon from the Governor of California. Sweeney had promised that he would help Hyland to obtain a pardon.

Sweeney and La Plante, each of whom had written supporting Hyland's application for a pardon, now actively worked to make sure the application was denied. Sweeney wrote withdrawing his support, and called the governor's office to recommend a denial of the pardon, falsely alleging that Hyland had released confidential juvenile court information in another matter. La Plante also withdrew his letter of support. Sweeney and La Plante also convinced another judge who had written in support of Hyland's pardon application to withdraw his support. Hyland appealed to Judges Wonder and Hanlon to prevent Sweeney and La Plante from continuing to retaliate against him, but the judges failed to act. In May 1989, the governor denied Hyland's pardon application, although the Board of Prison Terms and the California Supreme Court had unanimously recommended its approval. The governor's internal review procedure had reached the same conclusion recommending approval.

Hyland also alleged interference with his employer. Shortly after his termination in March 1989, Hyland obtained a position as a paid consultant to the National Center on Institutions and Alternatives ("NCIA"), a nonprofit organization that recommends sentencing options to defense counsel. Hyland's job was to interview juvenile detainees and write reports for presentation to sentencing judges. In June 1989, Hyland wrote to Judges Hanlon and Wonder asking them to prevent Sweeney and La Plante from continuing their retaliation. Hyland appeared at Juvenile Hall for a meeting with a juvenile detainee, and La Plante barred his entry.

In July, Judge Wonder called the Executive Director of the NCIA's Western Regional Office, Vincent Schiraldi, into a meeting. Schiraldi wrote in a subsequent letter to Hyland (attached as an exhibit to the complaint) that as a result of the meeting, the NCIA "must regrettably terminate" Hyland's employment on cases before San Francisco Juvenile Court because "Judge Wonder informed us that you were not to be allowed into the Juvenile Hall and that your presence on cases could be detrimental to our clients." [ER p. 44] On July 11, the Superior Court executive committee met and ratified the decision to exclude Hyland from Juvenile Hall.

In July 1989, Hyland interviewed for the position of director of the Juvenile Justice Commission. He alleges he was not selected for further interviews because of his memorandum about La Plante. Hyland also alleges that the defendants made a variety of public statements to retaliate against him, including Sweeney's false statement on local television news that Hyland had released to the public confidential juvenile court records, and Judge Wonder's statement in a newspaper article to the effect that Hyland was a disservice to his clients.

In January 1990, San Francisco voters passed Proposition L, which created the Juvenile Probation Commission ("JPC") and gave it authority over Juvenile Hall, removing supervisory authority from the Superior

Court. Sweeney resigned and was replaced by Fred Jordan as Chief Juvenile Probation Officer. In February 1990, Hyland and the NCIA wrote Jordan asking that Hyland be admitted to Juvenile Hall, and Jordan refused to lift the ban. In June 1990, Hyland wrote to the JPC asking for a review of Jordan's decision. The JPC voted on and ratified the decision to continue the ban in July 1990.

Hyland also applied for employment as Executive Secretary of the JPC and Director of Community Services Programs of the JPD. He was not considered for the positions.

## PROCEDURAL HISTORY

Hyland filed a complaint under 42 U.S.C. § 1983 in March 1990, and amended it in May 1990, alleging (in addition to state law claims) that the defendants violated his due process rights and his First Amendment rights by retaliating against him for the memorandum critical of La Plante's management of Juvenile Hall. In October 1990, the district court dismissed the federal claims for failure to state a claim, on the ground that Hyland's speech was not protected by the First Amendment and that he alleged no protected due process interest. The district court dismissed the state claims for lack of jurisdiction. This court reversed in part, affirming the dismissal of the due process claim but holding that Hyland's First Amendment claim was sufficient, and remanded "for the factual determination of whether the defendants' need to maintain an efficient and effective workplace justified Hyland's dismissal." *Hyland v. Wonder*, 972 F.2d 1129, 1143 (9th Cir.1992), *cert. denied*, 508 U.S. 908, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993) (*Hyland I* ).

Hyland filed a second amended complaint and moved for summary judgment on the First Amendment claim. The defendants asserted qualified immunity. The district court granted the individual defendants summary judgment on the ground of qualified immunity, finding that it was not "clearly established" in 1989 that a government volunteer possessed the same First Amendment rights as government employee. The court also

granted summary judgment to other defendants on claims not in issue here, and ordered further briefing on Eleventh Amendment and municipal liability issues.

Hyland moved for reconsideration, and on July 1, 1994, the district court denied the motion. Hyland argued that after his termination, any retaliation against him was directed at a private citizen, not a volunteer or employee, and that it was clearly established that a private citizen has a First Amendment right to be free from retaliation. The district court held that the post-termination retaliation was not actionable under § 1983, because the retaliation "fails to implicate sufficiently a protected property or liberty interest." [ER p. 187]

The district court granted summary judgment against Hyland on the remainder of his federal claims on February 9, 1995, and dismissed the state claims without prejudice. First, the district court ruled that Judges Wonder and Hanlon had Eleventh Amendment immunity as employees of the state rather than local government. Second, the district court ruled that the damages claims against Sweeney and La Plante in their official capacities were based on municipal liability, but that the facts showed as a matter of law that none of the defendants had final policy-making authority over Hyland's termination, and no one with such authority had ratified their decision to fire him. The court therefore did not rule on the factual issue this court remanded to it-"whether the defendants' need to maintain an efficient and effective workplace justified Hyland's dismissal." *Hyland I*, 972 F.2d 1129.

Hyland appeals.

## I. *Qualified Immunity*

■ We review a determination of qualified immunity *de novo*. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir.1993).

When a public official asserts qualified immunity for constitutional violations, the district court must apply a two-part analysis. The court must first determine whether the plaintiff has alleged a violation of a right that is clearly established and stated with particularity. The contours of

the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The plaintiff bears the burden of showing that the right he alleges to have been violated was clearly established. Second, the court must consider whether, under the facts alleged, a reasonable official could have believed that his conduct was lawful. It is the defendant's burden to show that a reasonable officer could have believed, in light of the settled law, that he was not violating a constitutional . . . right.

Collins v. Jordan, 110 F.3d 1363, 1369 (9th Cir.1997) (as amended) (quotations and citations omitted).

### A. Hyland's termination

Hyland alleged that Sweeney's actions in dismissing him violated his First Amendment right to express himself regarding the conditions at Juvenile Hall. We have held that as early as 1983 "[i]t could hardly be disputed that . . . an individual had a clearly established right to be free of intentional retaliation by government officials based upon that individual's constitutionally protected expression." Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1319 (9th Cir.1989). When the individual is a government employee, he or she has a right to speak on issues of public importance without being fired from public employment. Pickering v. Board of Educ., 391 U.S. 563, 574, 88 S.Ct. 1731, 1737–38, 20 L.Ed.2d 811 (1968). In Hyland I, we noted that the well-established "right of public employees to speak on matters of public concern . . . is an outgrowth of the constitutional tenet that public officials may not deny or deprive a person of a governmental benefit or privilege on a basis that infringes her or his freedom of speech." 972 F.2d at 1134.

Appellees do not argue that it was not clearly established that Hyland had a right to speak. Nor do they disagree with our conclusion in Hyland I that Hyland's memorandum· discussed a matter of public concern. Id. at 1137. Instead, they dispute that the termination deprived Hyland of a governmental benefit or privilege, "belabor[ing] the issue of Hyland's status as either a public employee or a volunteer." Id. at 1134. Unless· Hyland's right to a volunteer position

was clearly established in 1989, they claim, the defendants are protected by qualified immunity because a reasonable official would not have known that retaliating by firing him was unlawful.

In Hyland I, we held that Hyland's complaint stated a claim of a First Amendment violation:

[W]hether Hyland is labelled a public employee or a volunteer is not determinative of whether Hyland stated a claim of First Amendment infringement. Nor is the at-will nature of his position dispositive. The critical question is simply whether Hyland has alleged the loss of a valuable governmental benefit or privilege in retaliation for his speech. We conclude that the loss of a high-level volunteer position, such as that held by Hyland in the JPD, constitutes a deprivation of a valuable governmental benefit or privilege.

Id. at 1136. Appellees argue that until Hyland I was decided, it was not clearly established that the loss of a position such as Hyland's was a deprivation that would violate the First Amendment.

We disagree. Even disregarding that Hyland was paid for more than a third of his time as Sweeney's special assistant, it would have been evident to a reasonable official that Hyland's work was a valuable benefit, and that firing him because he expressed himself as he did violated the First Amendment.

It was clearly established before Hyland was terminated in 1989 that the government may not deny a person a valuable benefit "on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). When the valuable benefit is public employment, the government may not take it away when an employee speaks out on a matter of public importance. Pickering, 391 U.S. at 574, 88 S.Ct. at 1737–38; Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Courts must seek " 'a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest

of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick*, 461 U.S. at 138, 103 S.Ct. at 1685 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35).

Government benefits other than employment cannot be withdrawn merely because the government does not like the individual's speech; this proposition was clearly established in 1989. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327 n. 6, 22 L.Ed.2d 600 (1969) (welfare benefits); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) (unemployment benefits); *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) (tax exemptions). "We have specifically recognized that the rule of *Perry v. Sindermann* and *Connick v. Myers* applies beyond the employment context." *Hyland I*, 972 F.2d at 1135, (citing *Havekost v. United States Dep't of the Navy*, 925 F.2d 316 (9th Cir.1991)).

In *Havekost*, we considered whether qualified immunity protected the Navy when, in 1988, an officer revoked a grocery bagger's license to work for tips on a military base when the bagger criticized the head bagger. Although the license "was not an employment contract, but rather a revocable grant of permission to work for customer tips," and Havekost was not under the supervision or control of any government official, 925 F.2d at 317, we held that it was clearly established in 1988 that the government could not revoke the license if Havekost exercised her First Amendment right to speak on issues of public concern. Although Havekost was not an employee, we applied the *Pickering* "public concern" requirement. We held, however, that because the speech in question was not a matter of public concern but rather "nothing more than a workplace grievance," *id.* at 318, the First Amendment did not protect it.

That analysis applies here. Unlike *Havekost*, Hyland's speech clearly involved matters of public concern. Because, as *Havekost* states, it was clearly established in 1988 that a government benefit short of employment could not be revoked when an individual speaks out on a matter of public concern, then the government officials in this case cannot claim qualified immunity for their actions in 1989. A reasonable official should have known that it violated the First Amendment to dismiss Hyland and bar him from Juvenile Hall because of his protected expression.

> The fact of interference [with First Amendment rights] is not altered by the circumstance that the victims are not classified as employees.... Government officials may indeed terminate at-will relationships, unmodified by any legal constraints, without cause; but it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific ... views.

*O'Hare Truck Serv., Inc. v. City of Northlake*, —— U.S. ——, ——, ——, 116 S.Ct. 2353, 2359, 2361, 135 L.Ed.2d 874 (1996).

Appellees argue that it was not clearly established when Sweeney fired Hyland in 1989 that the particular benefit in this case, a highly-placed volunteer position, was protected from government action. We stated in *Hyland I* that "the opportunity to serve as a volunteer constitutes the type of governmental benefit or privilege the deprivation of which can trigger First Amendment scrutiny." 972 F.2d at 1135. Hyland's appeal, of course, had not yet been decided when Hyland was fired, so *Hyland I* alone cannot establish the right in question. Appellees insist that because there was no previous Ninth Circuit case involving a volunteer, no reasonable official would have known that the action of firing Hyland violated the First Amendment.

The Supreme Court and our case law do not require that degree of specificity.

> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the

light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).It was clearly established in 1988 that the government could not take action against an individual who, while not a salaried employee, received a valuable benefit analogous to employment, because that individual exercised his First Amendment right to speak out on a matter of public concern. *Havekost*, 925 F.2d at 317–18. In *Havekost*, we found such a valuable benefit existed without requiring that the plaintiff produce cases involving identical facts; we do the same here. When Hyland was fired in 1989, the "contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right," *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039: the right to speak on matters of public concern without the loss of a valuable government benefit.

Moreover, ten years before Hyland was fired, the Second Circuit had found a First Amendment violation on very similar facts. *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir.1979) held that the First Amendment applied when an individual lost a volunteer firefighter position for complaining about the morale and training of the department. The Second Circuit applied *Pickering*, balancing the "interest of the 'whistle blowers' who, in good conscience, seek to expose inefficiency and corruption in government with the interest of the governmental employer whose daily functioning in some cases demands performance without personal friction." *Id.* at 25. In *Janusaitis*, the court concluded that the First Amendment was not violated, because the volunteer firefighter's expression was incompatible with the department's need for close working relationships, smooth functioning, and healthy morale. *Id.* at 27; *see Hyland I*, 972 F.2d at 1135 n. 1. *Pickering*'s analysis had thus been applied to a volunteer position before *Havekost* or *Hyland I* were decided.

■ We do not hold that it was clearly established that Hyland's volunteer position was the equivalent of employment. We hold only that Hyland showed it was clearly estab-

lished that when he was fired, the *Pickering* analysis, created in the employment context, also applied to individuals who were not technically employees when they alleged (1) the loss of a valuable government benefit (2) in retaliation for their speech (3) on a matter of public concern. The defendants did not show that a reasonable official could have believed that firing Hyland because of his memorandum did not violate his constitutional rights. The district court therefore erred in granting qualified immunity for Hyland's termination to the defendants.

### B. *Post-dismissal retaliation*

The district court held that the individual defendants were protected by qualified immunity from Hyland's claims of continuing retaliation after he was fired, because the post-termination retaliation did not implicate any liberty or property right.

In *Hyland I*, we affirmed the district court's decision that Hyland failed to state a due process claim because he lacked a property or liberty interest in his position as a volunteer. While Hyland did not have a due process right to continue in his volunteer position, he did have a First Amendment right not to be retaliated against for his protected speech. *Perry*, 408 U.S. at 597–98, 92 S.Ct. at 2697–98 (lack of property interest in government benefit "is immaterial to [a] free-speech claim[ ].") As we held above, dismissal from a volunteer position can constitute unconstitutional retaliation. There is ample authority that retaliatory acts other than actual discharge can serve as the basis for a First Amendment claim. *See, e.g., Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1039 (9th Cir.1990) (ostracism, silent treatment, selective enforcement of the rules, and poor reviews can all be acts of retaliation); *Allen v. Scribner*, 812 F.2d 426, 429 (9th Cir.1987) (retaliation included transfer, defamatory statements to the media, intimidation, and harassment), *amended*, 828 F.2d 1445 (9th Cir.1987).

The district court erred in granting qualified immunity to the defendants for the acts of post-termination retaliation.

## II. *Eleventh Amendment Immunity*

██ The district court found that because the Superior Court was an arm of the state of California, Hyland's claims for damages against Superior Court Judges Wonder and Hanlon were claims against state officials barred by Eleventh Amendment sovereign immunity. We review de novo whether there is immunity from suit under the Eleventh Amendment. *Micomonaco v. Washington*, 45 F.3d 316, 319 (9th Cir.1995). The party asserting Eleventh Amendment immunity has the burden of proving its applicability. *ITSI TV Prods., Inc. v. Agricultural Ass'ns*, 3 F.3d 1289, 1291 (9th Cir.1993).

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend XI. The amendment also bars a citizen from bringing a suit against his own state in federal court. *Micomonaco*, 45 F.3d at 319. "[T]he reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Calif. v. Doe*, ── U.S. ──, ──, 117 S.Ct. 900, 903, 137 L.Ed.2d 55 (1997).

"[S]tate case law and constitutional provisions make clear that the [California Superior] Court is a state agency." *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110 (9th Cir.1987). In this suit, however, the Superior Court itself is not a defendant, only Judges Hanlon and Wonder. As judges paid by the state, they are state agents or employees, *see id.*, but they are not automatically entitled to sovereign immunity.

██ "Where the State itself or one of its agencies or departments is not named as defendant and where a state official is named instead, the Eleventh Amendment status of

the suit is less straightforward." *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). "We must look behind the pleadings to determine whether a decree in the case would operate in fact against the sovereign. If the judgment would actually run against the state treasury, the action is barred." *Zolin*, 812 F.2d at 1110 (quotations and citations omitted). If the state officials can show that "the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Regents of Univ. of Calif.*, ── U.S. at ──── ────, 117 S.Ct. at 903–04 (quotations omitted). If the state is not legally liable for any judgment against the named individuals, and local government, rather than the state, would be responsible for any money judgment rendered, an action against individual defendants who are state employees is not barred by the Eleventh Amendment. *Zolin*, 812 F.2d at 1110–11.

The judge defendants argue that their administrative function in overseeing the county's juvenile probation system did not transform them into local rather than state officials. That, however, is not the point. The question in this case is not whether the judges were acting administratively[1] or even whether they somehow "became" local officials. Instead, the issue is " 'who is legally obligated to pay the judgment that is being sought.' " *Regents of Univ. of Calif.*, ── U.S. at ──, 117 S.Ct. at 903 (quoting *Doe v. Lawrence Livermore Nat'l Lab.*, 65 F.3d 771, 777–78 (9th Cir.1995) (Canby, J., dissenting)).

██ Hyland argues that the real party in interest is the city, which would pay any money judgment entered against Judges Wonder and Hanlon. Defendants admitted in the district court that the state would not have a legal duty to pay any judgment against the Superior Court or its judges, although they also claimed that Eleventh Amendment immunity would prevent the en-

---

**1.** A judge may lose the protection of *judicial* immunity when performing an administrative act. *Crooks v. Maynard*, 913 F.2d 699, 700 (9th

Cir.1990). Judges Hanlon and Wonder do not argue that they are entitled to judicial immunity.

try of any judgment. [ER pp. 148–49] On appeal, the defendants do not point to any evidence that the state would be liable for the judgment. The judges have not met their burden to show that they are protected by Eleventh Amendment immunity. We therefore hold that the district court erred in finding that the judges were immune from suit.

### III. *Municipal Liability*

The district court ordered briefing on this issue, and the defendants filed a motion for summary judgment arguing that there was no municipal liability. The district court granted the motion, holding that the City and County of San Francisco were not liable for damages for Hyland's termination because none of the named defendants had final policymaking authority, and Hyland's firing was never ratified by any policymaker. The district court also held that Hyland's claims of damages for post-termination retaliation failed as a matter of law, because on some of the claims the JPC did not have final policymaking authority. As for Hyland's ban from Juvenile Hall, over which the JPC did have policymaking authority, the district court held that the JPC never formally ratified the ban.

 The complaint names city officials Sweeney, Jordan and La Plante in their official capacities, which " 'represent[s] only another way of pleading an action against an entity of which an officer is an agent.' . . . [T]he real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985) (quoting *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). "A local government entity cannot be held liable under § 1983 unless the plaintiff alleges that the action inflicting injury flowed from either an explicitly adopted or a tacitly authorized [governmental] policy." *Ortez v. Washington Cty.,* 88 F.3d 804, 811 (9th Cir.1996) (quotation and citation omitted).

[A] plaintiff may show that, rather than being the product of general official policy, on a given occasion the conduct was the result of "a deliberate choice . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1299–1301, 89 L.Ed.2d 452 (1986). Finally, a plaintiff may show that an official policymaker either delegated policymaking authority to a subordinate or ratified a subordinate's decision, approving the "decision and the basis for it." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126–27, 108 S.Ct. 915, 925–26, 99 L.Ed.2d 107 (1988).

*Fuller v. City of Oakland,* 47 F.3d 1522, 1535 (9th Cir.1995) (as amended).

### A. *Termination and ban from Juvenile Hall*

 The district judge found as a matter of law that final policymaking authority over personnel matters in the JPD rested with the Board of Supervisors or the Civil Service Commission, and that Sweeney, as the Chief Juvenile Probation Officer ("CJPO"), therefore had no final authority to terminate Hyland. The judge also concluded that it was undisputed that neither the Board of Supervisors nor the Civil Service Commission ever ratified the decision to fire Hyland. Hyland argues that the Superior Court had been delegated final policymaking responsibility over matters in the JPD, and that the judges delegated their authority to fire Hyland to Sweeney, his immediate supervisor.

 "[T]he identification of policymaking officials is a question of state law," *Praprotnik,* 485 U.S. at 124, 108 S.Ct. at 924–25, and under California law, a city's Charter determines municipal affairs such as personnel matters. *City and County of San Francisco v. Patterson,* 202 Cal.App.3d 95, 102, 248 Cal.Rptr. 290 (Cal.Ct.App.1988).

The Charter of the City of San Francisco provides that

[t]he chief probation officer of the juvenile court shall appoint such assistants, deputies and employees as may be allowed or provided by the board of supervisors, subject to confirmation by the juvenile proba-

tion board or committee created by state law.... The civil service provisions of this charter shall apply to and govern the assistants, deputies and employees of the ... chief probation officer of the juvenile court.... [T]he said chief probation officer of the juvenile court shall be the appointing officer as to his assistants, deputies and employees, subject to confirmation as aforesaid.

San Francisco, Calif., Charter § 4.105. All boards appointed by the mayor (including the juvenile probation board) "have powers and duties ... [t]o prescribe reasonable rules and regulations ... for the conduct and government of its officers and employees," Charter § 3.500(a), and to hold executive sessions to "consider the appointment, employment or dismissal of a public officer or employee." *Id.* § 3.500(f)(1).

Hyland argues that the Charter thus delegates authority over employees to the juvenile probation board, which, in this case, was the Superior Court judges. Citing deposition testimony by Judge Wonder that the judges "left the internal management of the Juvenile Probation Department to [Sweeney] and attempted not to interfere.... We did not formulate any policy concerning employees," [ER pp. 170, 173] Hyland contends that the judges in turn delegated the Juvenile Probation Board's authority to Sweeney, the CJPO, and his successor, Jordan.

The defendants respond that, under the Charter, the Board of Supervisors or the Civil Service Commission retained power over personnel decisions, in which case none of the named defendants was a final policymaker. The district court agreed with the defendants, concluding that any personnel decisions by Sweeney or Jordan as CJPO were subject to ratification by the Board of Supervisors or the Civil Service Commission, and that in this case no ratification occurred. The court failed to discuss whether the Board of Supervisors or the Civil Service Commission delegated authority over personnel matters to the Superior Court in its capacity as the juvenile probation board.

Absent from the defendants' and the district court's discussion of who had final policymaking authority over Hyland's status is any acknowledgment that Hyland was not, strictly speaking, an employee, but a volunteer. On the one hand, the defendants argue that Hyland cannot be treated as an employee as regards his First Amendment rights; on the other hand, they argue that he must be treated as an employee, and his firing must be treated as a personnel decision, for the purpose of establishing as a matter of law that the city is not liable under *Monell.* Hyland cannot be an employee for one purpose and not for the other. As a volunteer, he does not automatically fall under the provisions of the city Charter regarding employees. The Charter does not specify who has policymaking authority over hiring and firing volunteers.

Further, Sweeney's own testimony was that Hyland, rather than being an employee, was a volunteer "professional and personal confidante," with "no official connection to any other member of the Department." [SER pp. 3–4] Sweeney's declaration stated that the civil service system did not recognize Hyland's volunteer position, which was "not authorized under any rule, ordinance, regulation or law [and] was based entirely on an unwritten and personal understanding." [SER p. 4] He further stated that he "severed Hyland's volunteer status as my assistant" because the memo destroyed his "confidential relationship" with Hyland, which was "the sole reason he was allowed access to the Department and Juvenile Hall." [SER p. 7]

The uncontroverted evidence thus establishes that Hyland was not an employee, and neither the Civil Service Commission nor the Board of Supervisors were the final policymakers regarding his position; that the Superior Court judges in charge of the JPD delegated all internal management issues to Sweeney; and that Sweeney exercised his delegated powers in appointing Hyland and, eventually, in terminating Hyland as his volunteer personal assistant. The district court therefore erred in granting summary judgment to the defendants on the *Monell* issue.

We remand to the district court to enter summary judgment for Hyland on this issue. The facts necessary to determine *Monell* liability are not in dispute, and the evidence in the record establishes that Sweeney, in ter-

minating Hyland's tenure as a volunteer, acted as a final policymaker with regard to Hyland's position as his volunteer personal assistant. Hyland is entitled to summary judgment on municipal liability. *See Lawyers Title Insurance Corp. v. Honolulu Fed. Sav. & Loan Ass'n*, 900 F.2d 159, 164 (9th Cir.1990) (as amended) (when record supports only one resolution of a factual issue, court of appeals can order district court to enter judgment on that issue).

### B. *Ban from Juvenile Hall*

Hyland argues that it was unconstitutional retaliation for Judge Wonder to ban him from Juvenile Hall after he was fired, which ban prevented him from performing his work for the National Center on Institutions and Alternatives interviewing juvenile detainees. After Proposition L transferred the authority over Juvenile Hall from the Superior Court judges to the Juvenile Parole Commission ("JPC") in January 1990, Hyland alleges that then CJPO Jordan refused to consider his job applications and continued to ban him from Juvenile Hall. Schiraldi, who was then a member of the JPC's executive committee, testified in an uncontested affidavit that the executive committee met in July 1990 to discuss whether to continue the ban, and approved Jordan's refusal to allow Hyland to enter.

Schiraldi's affidavit clearly states that Judge Wonder approved the initial ban of Hyland from Juvenile Hall. It also establishes that the JPC ratified the continued ban of Hyland, and the defendants concede that the JPC had final policymaking authority over the ban after the JPC was established in January 1990. Nevertheless, the district court found that no ratification occurred because the ratification was not reported in the official minutes of the executive committee meeting. Such a failure to report an action does not defeat an allegation of municipal liability, which is available "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2036. The executive committee's ratification does not require formal approval for the purpose of establishing a violation of federal law under § 1983. To find otherwise would allow municipalities to ratify with impunity the unconstitutional actions of their officers, as long as they concealed that ratification by failing to report their actions through official channels.

We hold that as a matter of law the uncontradicted evidence in the record establishes that the officials with authority over access to Juvenile Hall, Judge Wonder of the Superior Court and later the JPC, both ratified the ban of Hyland from Juvenile Hall, and so municipal liability exists. Hyland was entitled to summary judgment on this issue, and we remand to the district court for entry of such a judgment. *See Lawyers Title*, 900 F.2d at 164.

### C. *Job applications*

Hyland also alleges that his job applications to the JPC, when Jordan was CJPO, were rejected in retaliation for his memorandum. After Proposition L, the city Charter gave the JPC the power to create positions which were not subject to civil service provisions. *See* Charter § 3.699–2. [SER p. 50] Both the positions that Hyland applied for were civil service exempt.

Schiraldi's affidavit states that the JPC's executive committee approved Jordan's "actions." The defendants introduced no opposing affidavit or other evidence to establish that the executive committee did not approve Jordan's actions, or that it approved some but not all of his actions. On appeal, they argue only that the CSC had the final policymaking authority over personnel decisions. That is irrelevant, as the positions for which Hyland applied were civil service exempt.

We remand for entry of summary judgment for Hyland on this ground for *Monell* liability.

### IV. *Attorney Fees*

Hyland requests attorney fees under 42 U.S.C. § 1988. As we held in *Hyland I*, it is premature to award attorney fees, because Hyland cannot be designated a prevailing party until all issues have been resolved and

he has obtained some relief on the merits of his claims that benefits him directly. *Farrar v. Hobby*, 506 U.S. 103, 111–14, 113 S.Ct. 566, 573–74, 121 L.Ed.2d 494 (1992); *Martinez v. Wilson*, 32 F.3d 1415, 1422 (9th Cir.1994).

## CONCLUSION

We hold that the district court erred in granting qualified immunity to the individual defendants. We also hold that the district court erred in determining that the action against Judges Wonder and Hanlon was barred by Eleventh Amendment immunity, because those defendants introduced no evidence that the state would be legally liable for any damages assessed against the judges. We hold that Hyland is entitled to summary judgment on the issue of *Monell* liability, because uncontradicted facts show that Sweeney had the policymaking authority to fire a volunteer in a position such as Hyland's, and that the JPC ratified the decision to ban Hyland from Juvenile Hall and the refusal to consider Hyland for future jobs.

We remand for entry of partial summary judgment in favor of Hyland in accordance with this opinion. We further remand for determination of the factual issue remanded in *Hyland I*, "whether the defendants' need to maintain an efficient and effective workplace justified Hyland's dismissal." *Hyland I*, 972 F.2d at 1143. We again direct the district court's attention to *Hyland I*'s detailed description of the necessary inquiry. *Id.* at 1139–40. We emphasize that because Hyland's speech involved a matter of public concern, the defendants bear the burden to justify the actions taken against Hyland. *Id.* at 1139. The defendants' burden to justify the termination and subsequent retaliation is particularly heavy, because the public's interest in the administration of the juvenile justice system is great. *See Connick*, 461 U.S. at 150, 103 S.Ct. at 1691–92; *Voigt v. Savell*, 70 F.3d 1552, 1560 (9th Cir.1995) (burden to justify discharge depends on nature of employee speech), *cert. denied*, ⸺ U.S. ⸺, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996). Hyland's memorandum addressed only matters of great public concern and was circulated only to his superiors and to relevant authorities. As we stated subsequent to the opinion in *Hyland I*,

> [t]he First Amendment balancing test [of *Pickering* ] can hardly be controlled by a finding that [workplace] disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office. In other words, the County does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure.

*Johnson v. Multnomah Cty.*, 48 F.3d 420, 427 (9th Cir.1995) (quotations and citations omitted).

**REVERSED AND REMANDED.**