[Nos. A108246, A109226. First Dist., Div. One. Feb. 22, 2006.]

ALLEN HARMAN, Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Appellants.

COUNSEL

Dennis J. Herrera, City Attorney, Wayne K. Snodgrass, Sherri Sokeland Kaiser and Vince Chhabria, Deputy City Attorneys; Moscone, Emblidge & Quadra, G. Scott Emblidge, Rachel J. Sater and Lina R. Guillen for Defendants and Appellants.

Nageley, Meredith & Miller, Andrea M. Miller; Pacific Legal Foundation, Sharon L. Browne and Paul J. Beard II for Plaintiff and Respondent.

OPINION

**SWAGER, J.**—In an earlier appeal in this employment discrimination case, we reversed a summary judgment in favor of the defendants, City and County of San Francisco, individual members of the San Francisco Airport Commission, and the director of the San Francisco International Airport (hereafter the City) with respect to one cause of action of one plaintiff, Allen Harman (hereafter Harman), who claimed to have suffered an approximate one-year delay in promotion as the result of racial discrimination in violation of the federal Civil Rights Act of 1871 (42 U.S.C. § 1983). Following a seven-day trial, the jury awarded Harman compensatory damages of $30,300 based on a special verdict finding discrimination against White males in promotional opportunities, and the trial court subsequently awarded Harman's counsel $1.1 million in attorney fees. We affirm the judgment for damages but remand the award of attorney fees for further consideration.

FACTUAL AND PROCEDURAL BACKGROUND

In September 1999, three White males, including Harman, who were employed as airfield safety officers at the San Francisco International Airport, filed a complaint in federal court alleging employment discrimination. After lengthy federal court proceedings involving, inter alia, an appeal to the Ninth Circuit Court of Appeals, the parties stipulated to filing a new complaint in state court. The complaint initially sought only equitable relief but was later amended to include a cause of action for damages. The first three causes of action of the first amended complaint alleged discrimination on the basis of race and sex in violation of Proposition 209 (Cal. Const., art. I, § 31) and the equal protection clause of the Fourteenth Amendment to the United States Constitution and sought prospective equitable relief through an injunction, declaratory judgment, and writ of mandate commanding the City "to implement race- and sex-neutral recruitment, hiring, and promotional policies." The fourth cause of action sought damages under Proposition 209

and the federal Civil Rights Act as codified in title 42 United States Code section 1983 (hereafter section 1983).

The trial court sustained the City's demurrer to the fourth cause of action, as it stated a claim of damages under Proposition 209, on the ground that it did not allege compliance with the government claims act. (Gov. Code, § 905 et seq.) After completion of discovery, the court granted the City's motion for summary judgment on the remaining causes of action and plaintiffs appealed.

We affirmed the summary judgment with respect to the claim of prospective equitable relief in the first three causes of action, finding that the City adopted an equal employment opportunity plan in July 2000 that stated policies consistent with evolving legal standards of employment discrimination under equal protection jurisprudence and Proposition 209.[1] We found "no basis in the record to question the Airport's commitment to conform to changing legal standards in the area of employment policy." We also affirmed the summary judgment with respect to the claims of damages of two of the three defendants. In the case of Harman, we affirmed the demurrer to the claim for damages under Proposition 209, but we found a triable issue of fact relating to his claim of damages under section 1983 arising from a delay in receiving a promotion to the job classification of "9220 Airport Operations Supervisor."

The complaint originally attacked three personnel decisions: the termination of a pool of eligible candidates for a provisional appointment, the appointment of an acting supervisor for a 90-day period in April 1999, and the permanent appointment of airport operating supervisors through the normal civil service procedure. Since Harman received a permanent promotion as airport operations supervisor in May 2000, his claim for damages was necessarily restricted to the other two personnel decisions.

The summary judgment dismissing the claim for damages in the earlier appeal was based on the City's contention that plaintiffs failed to show evidence of a discriminatory purpose in the challenged personnel actions. In reversing the dismissal of Harman's section 1983 claim, we found a triable issue of fact as to a racially discriminatory purpose in the termination of the provisional pool and the acting appointment. The parties did not raise, and we did not consider another element of plaintiffs' case required by *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018]—evidence that the personnel decision arose from the execution of official policy or custom of the City.

---

[1] Our decision noted that the airport's revised policy in July 2000 anticipated by four months the decision of the California Supreme Court in *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537 [101 Cal.Rptr.2d 653, 12 P.3d 1068], rendered in November 2000.

In the trial following remand, the City moved for nonsuit on the ground that Harman's case-in-chief failed to produce evidence satisfying *Monell* requirements. After the motion was denied, the City requested an instruction that identified the Civil Service Commission of San Francisco as the City's policy maker in personnel administration. The trial court declined to identify the commission or any other official or municipal body as the source of official policy.

Responding to a special verdict form, the jury found that the City had "an official policy or custom to intentionally discriminate against [W]hite males in promotional opportunities at the San Francisco International Airport." The jury then awarded Harman $15,300 as damages for economic harm and another $15,000 as damages for emotional distress. The City moved for judgment notwithstanding the verdict and for new trial relying chiefly on a claim of *Monell* error. The trial court denied the motions and entered judgment for Harman.

Harman then filed two motions for attorney fees under title 42 United States Code section 1988 in the total amount of $1,095,202. He sought $713,152.75 on behalf of the Pacific Legal Foundation, which filed the original action, and $382,050.23 for trial counsel, Andrea Miller. The trial court awarded the entire sum finding that it was "reasonable, after due consideration of the success obtained relative to the relief sought and other circumstances of this case." The City filed a timely notice of appeal.

## DISCUSSION

In its opening brief, the City states that it does not challenge the sufficiency of the evidence on discriminatory purpose in deference to our ruling reversing the summary judgment of Harman's section 1983 claim and confines its arguments to the claim of *Monell* error. But the factual connection between issues of discriminatory purpose and *Monell* error is so close that it is impossible to meaningfully consider one without the other. We will therefore review the evidence of discriminatory purpose before addressing *Monell* issues.

A. *Evidence of Discriminatory Purpose*

1. *Applicable Law*

As explained in more detail in our earlier decision, "[s]ection 1983 provides a remedy for state action that purposefully discriminates on the basis of race in violation of the equal protection clause of the Fourteenth Amendment. [Citation.] The protection afforded by section 1983 includes

relief from discriminatory employment practices of public employers." (*Poolaw v. City of Anadarko* (10th Cir. 1981) 660 F.2d 459, 462.) To recover damages for an equal protection violation under section 1983, a plaintiff must show that the municipality's action was motivated by a "discriminatory intent or purpose." (*Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 265 [50 L.Ed.2d 450, 97 S.Ct. 555].) "[T]he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." (*Washington v. Davis* (1976) 426 U.S. 229, 240 [48 L.Ed.2d 597, 96 S.Ct. 2040].)

It is not necessary to prove that the municipality's action "rested solely on racially discriminatory purposes." (*Arlington Heights v. Metropolitan Housing Corp., supra,* 429 U.S. 252, 265.) In *Arlington Heights*, the Supreme Court explains, "[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." (*Id.* at pp. 265–266, fn. omitted.)

Beginning with *University of California Regents v. Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733], the Supreme Court has interpreted the equal protection clause of the Fourteenth Amendment as extending protection against racial discrimination that may be asserted by a person of any race, without regard to membership in a group suffering from a history of racial discrimination. As stated in *Richmond v. J. A. Croson Co.* (1989) 488 U.S. 469, 494 [102 L.Ed.2d 854, 109 S.Ct. 706], "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification."

A plaintiff is not entitled to relief, however, unless he can show that he was injured by the challenged action. In *Texas v. Lesage* (1999) 528 U.S. 18 [145 L.Ed.2d 347, 120 S.Ct. 467], the plaintiff claimed that he was refused admission to a Ph.D. program because of his race. The university secured a summary judgment on the ground that the plaintiff was not a close contender for the graduate program. Affirming the judgment, the Supreme Court held: "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration . . . . [¶] Simply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." (*Id.* at pp. 20–21.)

## 2. *Factual Background*

Harman earned a college degree in aviation business administration, with an emphasis in airport management, and began working in 1989 for an aviation company. Two years later, he took an entry-level job with San Francisco International Airport (hereafter the Airport). In December 1993, he accepted the position of airfield safety officer. During the next five years he consistently received outstanding performance reviews for his work in this position, and in 1998 he began to actively seek a promotion.

The Airport fills all permanent positions through the civil service merit system mandated by section 10.101 of the Charter of the City and County of San Francisco (hereafter Charter section 10.101), but a manager will sometimes ask the Airport's human resources department to fill a vacancy for which there is no civil service list in existence. The department may then make arrangements for a provisional appointment which will be effective for a maximum of three years or until a permanent appointment can be made in accordance with normal civil service procedures. In making a provisional appointment, the department creates a pool (or list) of eligible employees through its own screening process, which is typically faster and less thorough than the procedure for permanent appointments through the civil service system. Provisional eligibility pools are created for current vacancies but are occasionally kept open to fill additional vacancies in the job classification that later occur.

While provisional appointments are made outside the normal civil service procedures, they require the approval of the equal employment opportunity (EEO) manager of the City's central human resources department. The EEO manager at all times relevant to this appeal was Dorothy Yee. She or her staff in the central human resources department reviewed all the Airport's choices for provisional appointments and possessed the power to approve or disapprove its selection.[2]

Alternatively, the Airport can select an employee to serve 90 days on an acting assignment. The procedure for selecting employees for such acting assignments follows the same general steps as that for provisional appointments, with selection from a list of eligible employees, but it proceeds more expeditiously and does not require approval of the City's EEO manager.

In 1999, the Airport's work force was expanding in anticipation of an increase in staffing needs with the construction of a new international

---

[2] Although it is undisputed that Yee possessed this power, the parties have not provided us with a citation or other explanation of its legal basis. At trial Rafael Centeno, the Airport human resources manager, offered the opinion that the authority was "probably in the civil service rules."

terminal building. For the 1998–1999 fiscal year the operations division for which Harman worked was planning 193 new hires. The labor market for those positions that required experience in aviation, such as airport operations supervisor, was dominated by White males and lacked ethnic and racial diversity. Airport recruited applicants from other airports, airlines, and flight schools, but it received few applications from outside the airport for provisional appointments.

In an announcement issued in October 1997, and later revised in January 1998, Airport management requested applications for a provisional appointment to the position of 9220 Airport Operations Supervisor to fill a current vacancy. It received 21 applications, all from the San Francisco Bay Area, and interviewed 14 of the applicants. From this number, management selected a provisional pool of seven eligible employees, including Harman. All persons in the pool were racially White. Management filled the current vacancy by appointing a White female, who was then serving as an acting supervisor, but kept the pool open for later appointments. "Three or four months" later, management made a second appointment from the pool—a White male who had ranked highest in the interviews.

In late August 1998, the operations department decided to request approval of the promotion of a third person from the provisional pool, Michael Robert, but the formal written request to Dorothy Yee, the EEO manager of the City's human resources department, was apparently not submitted until October 19, 1998. Yee testified that she initially objected to the appointment because it drew from a job category, airfield safety officer, with greater ethnic and racial diversity than was found in the supervisory level. Andrea Gourdine, the City's Human Resources director, conveyed the concerns of the EEO department to John Martin, the Airport director in a letter dated November 18, 1998. She noted among other things that "five appointments have been made to class 9220 since 1995; all five are White."

In a letter dated October 28, 1998, Valerie Jeffries, the personnel analyst in charge of processing the provisional appointment, presented Yee with a detailed justification for the promotion of Robert but she did not immediately secure the desired approval. Martin made further effort to defend Robert's appointment in a letter to Gourdine dated December 17, 1998. Yee then approved the appointment by signing a personnel action form on January 4, 1999.

The initial interviews for the 9220 position were conducted by three middle management supervisors, Kimberly Dickie, Glenn Brotman, and Drake Poston, who were responsible for making recommendations to Lamont Foster, the airport operations superintendent, who made the actual selections

for promotion. They interviewed the provisional pool again before recommending Robert to make sure of the current status of the candidates. According to Brotman and Dickie, they were disposed to recommend Harman next for appointment from the pool. Dickie recalls telling Harman that he had done well and should "feel very good about another opportunity."

The delayed and contested approval of Robert effectively ended the consideration of Harman for promotion from the provisional pool. With the passage of time, the pool became increasingly unsuitable for use because it was less likely to contain all potentially available candidates. Provisional pools ordinarily were not kept open longer than six months; the pool for the 9220 position was a year old by the time Robert was appointed. Jeffries testified that she was unwilling to risk incurring again the delays and effort required to secure EEO approval of Robert's appointment.

At trial, plaintiff's counsel sought to link Harman's delayed promotion to a document, known as the Airport's diversity staffing plan, which the airport director of human resources, Rafael Centeno, prepared for use in federal grant applications.[3] In general, the plan stated the goal of employing "a workforce at San Francisco International Airport which is reflective of the available labor market for each occupational category in San Francisco and San Francisco/Bay Area." The document analyzed the extent that particular ethnic and racial groups were underrepresented in particular job categories relative to the regional labor market and expressed the objective of reducing these levels of underrepresentation.

The EEO manager, Dorothy Yee, testified that the Airport's diversity staffing plan was sent to her for review and comment, but she did not submit it to the civil service commission for approval, and she did not consult it in reviewing the Robert appointment. She claimed to be guided instead by civil service commission rules and by policies and procedures promulgated by the City's human resources director. Only fragmentary documentation of these rules and policies were introduced at trial and submitted to the jury.[4] Nevertheless, we regard the diversity staffing plan as admissible evidence of policies that pervaded City personnel administration. Centeno testified that he attempted to draft the plan to be consistent with a corresponding City policy statement; it was reviewed not only by Dorothy Yee but also by Theresa Lee,

---

[3] Plaintiff claims that the diversity staffing plan was approved by the Airport commission, but the record discloses only that it was approved by the airport director, John Martin, and disseminated to "senior and management staff."

[4] Rule 3 of the civil service commission, introduced as a plaintiffs' exhibit, stated the policy "to achieve a qualified workforce that reflects the labor force availability of minorities and women in San Francisco." (S.F. Civil Service Com. Rules, rule 3, § 3.1.3 [affirmative action policy].)

the deputy airport director for administration, and it was approved by John Martin, the airport director.

We find portions of Yee's trial testimony that reflected a concern for underrepresentation of minorities in particular job categories that mirrored the policy of the diversity staffing plan. A handwritten note dated December 17, 1998, of Yee's conversation with Centeno went further: it revealed an intent to pressure Airport management to make minority promotions to positions in which they were underrepresented. Yee wrote: "pushing Lamont Foster to hire next appts will be minority."

In late December 1998, the Airport personnel management communicated to the central human resources department its desire to schedule a civil service examination for the 9220 position, but this examination process took six to 12 months to carry out and management anticipated a more immediate need to make appointments. On January 8, 1999, the Airport management issued an announcement for a new provisional appointment, thus effectively canceling the existing provisional pool to which Harman belonged. Shortly thereafter the operations management decided it needed a still shorter time schedule for the appointment. On March 5, 1999, Lamont Foster disseminated an announcement that there would be an acting appointment for the position. All applicants for the recent provisional announcement were to be considered without a need for submitting new applications.

Seventeen employees applied for the acting position, including Harman. Their applications and resumes were screened by a human resources representative, Clarice Clarke and two upper-level employees in the operations department, Lamont Foster, airport operations superintendent, and Don Whittaker, assistant deputy director of operations. They independently rated the employees on four criteria on a scale of one to five and averaged their scores. The top six applicants were selected for interviews. None of the members of the former provisional pool were selected for the interview stage. Harman received a letter from Clarice Clarke dated March 25, 1999, informing him that he was not among the candidates advancing to an interview stage.

Three of the six employees who proceeded to the interview stage were minorities—a Pacific Islander male, an African-American woman, and a Hispanic male—and they were ranked as the top three candidates following the interviews. Unlike the Robert provisional appointment, the record of the selection process does not affirmatively reveal that race or ethnicity was taken into account in the selection process. Plaintiffs, however, sought to draw such an inference by introducing statistical studies prepared by the Airport human resources staff that monitored the composition of the work force by gender, ethnicity and race during this period.

The operations management team ranked Dennis Neves, the Pacific Islander, highest among the applicants, and his promotion was announced on April 12, 1999. Neves had outstanding qualifications for a supervisory position. He had been employed as an airfield safety officer for approximately eight years and had previously worked for 19 years in the airline industry, mostly in supervisory positions. For over 10 years, he had worked as a station manager for Air Cal Airlines in various cities and continued with this work for about three years after the airline was acquired by American Airlines. Though Neves had not applied for the provisional appointment, he had previously qualified for the interviews in applications for higher supervisory positions.

The record of the preliminary screening process indicates that Neves received markedly higher scores than Harman, who lacked comparable experience in supervisory positions. The two scoring sheets disclosed in the record show that Harman ranked consistently as 10, while Neves received scores 13 and 20.

In September 1999, the City issued an announcement of a civil service examination for the position of 9220 Airport Operations Supervisor. Harman qualified for the eligibility list and was promoted in May 2000.

### 3. *Sufficiency of the Evidence*

We conclude that the record supports a finding that racial discrimination was a "motivating consideration" in the termination of the provisional pool. As we have seen, the cancellation of the pool was not a deliberate decision but rather an action that was effectively compelled by the lengthy and contested process of securing the approval of the EEO manager, Dorothy Yee, for the provisional appointment of Robert. The City argues that the provisional pool was then too old. It notes that such pools ordinarily did not stay open for longer than six months and the pool in question was extended approximately a year to allow the Robert promotion. But the Airport faced an unusual demand for increased staffing with the building of the new international terminal, and three Airport employees involved in processing the Robert promotion—Jeffries, Dickie and Brotman—testified that they contemplated the possibility of making a further appointment from the provisional pool before encountering resistance and delays in seeking approval of this promotion.

The record is somewhat unclear as to the standards applied by Yee in delaying the Robert promotion. Plaintiffs' counsel sought to link the alleged discrimination to the Airport's diversity staffing plan, and presented some evidence of other policies possibly guiding the City's EEO manager in

approving provisional appointments. Yee's memorandum of December 17, 1998, appeared to reveal an intent to "push" the airport operations superintendent, Lamont Foster, to make minority appointments without any balancing of policy interests. Particularly in light of this memorandum, we consider that the jury had a reasonable basis to conclude that a racially discriminatory purpose, i.e., a preference for the hiring of minorities in a job category in which they were underrepresented, was a motivating factor in Robert's contested promotion, which led inevitably to abandonment of the provisional pool, which included Harman, as a source of provisional appointments.

The evidence of a discriminatory purpose was less compelling in the case of the acting appointment. No inference of discrimination should be drawn from the Airport's monitoring of its employee force with respect to race and gender. As stated in *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 46 [112 Cal.Rptr.2d 5], "[a]ccurate and up-to-date information is the sine qua non of intelligent, appropriate . . . administrative action." The case for discrimination rested on Yee's possible influence, as suggested by her memorandum of December 17, 1998, and on the unusual success of minorities both in the preliminary screening process and in the interviews.

Whether or not this evidence would justify a finding of discrimination, the record clearly establishes that Harman cannot claim to be injured by an impermissible racial criterion under the principle of *Texas v. Lesage, supra,* 528 U.S. 18. The acting appointment went to an employee, Dennis Neves, who had superior qualifications for the position. Thus, whether or not the selection process involved impermissible considerations, Harman cannot base his claim for damages under section 1983 on the acting appointment because the Airport would not have promoted him ahead of Neves in any event.

B. *Requirements of* Monell

1. *Legal Background*

The City's assignments of error in this appeal revolve around the same point: the contention that Harman failed to prove a policy or custom of the kind required by *Monell v. New York City Dept. of Social Services, supra,* 436 U.S. 658 (*Monell*). Departing from an earlier precedent, *Monell* held that municipalities could be sued directly for damages resulting from deprivation of a constitutional right, but the holding was subject to an important limitation. To find a municipality liable under section 1983, a plaintiff must identify a municipal policy or custom that caused the constitutional injury. (*Id.* at p. 694; *Board of Comm'rs of Bryan Cty. v. Brown* (1997) 520 U.S. 397, 403 [137 L.Ed.2d 626, 117 S.Ct. 1382]; *Abbott v. Village of Winthrop Harbor* (7th Cir. 2000) 205 F.3d 976, 981.) This limitation on the scope of section 1983

"does not create a 'defense'. It identifies an element of a plaintiff's [damages], so the burden is on the plaintiff to demonstrate the essential policy or custom." (*Smith v. Chicago School Reform Bd. Of Trustees* (7th Cir. 1999) 165 F.3d 1142, 1149; see *Board of Comm'rs of Bryan Cty. v. Brown, supra,* at p. 403.)

The *Monell* plaintiffs were a class of female employees of New York City who complained that their departments "had as a matter of official policy compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." (*Monell, supra,* 436 U.S. 658, 661.) The lower courts found a constitutional violation but ruled that the City was immune from liability under section 1983. Reversing the lower court ruling, the Supreme Court held that local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." (*Monell, supra,* at p. 690.) In addition, the local governments "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." (*Id.* at pp. 690–691.)

The *Monell* court limited this holding by stating: "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." (*Monell, supra,* 436 U.S. 658, 691.) It concluded that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." (*Monell, supra,* at p. 694.) The court found that the plaintiffs' case, which was based on a written rule,[5] unquestionably involved "official policy as the moving force of the [claimed] constitutional violation . . . ." (*Monell, supra,* at p. 694.)

While the municipal policy could easily be identified in *Monell,* the demarcation of the limits of municipal liability has proven to be elusive under other circumstances, prompting the Supreme Court to revisit the issue. (*Board of Comm'rs of Bryan Cty. v. Brown, supra,* 520 U.S. 397; *Jett v. Dallas Independent School Dist.* (1989) 491 U.S. 701 [105 L.Ed.2d 598, 109 S.Ct. 2702]; *Canton v. Harris* (1989) 489 U.S. 378 [103 L.Ed.2d 412, 109 S.Ct. 1197]; *St. Louis v. Praprotnik* (1988) 485 U.S. 112 [99 L.Ed.2d 107,

---

[5] See *Pembaur v. Cincinnati* (1986) 475 U.S. 469, 481 [89 L.Ed.2d 452, 106 S.Ct. 1292] (plur. opn. of Brennan, J.).

108 S.Ct. 915] (plur. opn. of O'Connor, J.); *Pembaur v. Cincinnati, supra,* 475 U.S. 469 (plur. opn. of Brennan, J.); *Oklahoma City v. Tuttle* (1985) 471 U.S. 808, 824 [85 L.Ed.2d 791, 105 S.Ct. 2427].) We find *Praprotnik* and *Pembaur* to be particularly instructive.[6]

*Praprotnik* concerned a municipal employee who was transferred from one department to another and then laid off. He brought suit under section 1983 alleging that these actions were in retaliation for a successful appeal of an earlier suspension and therefore violated his First Amendment rights. The court found that the officials responsible for the plaintiff's transfer and discharge did not possess the policymaking authority necessary for municipal liability. The applicable law placed the authority to adopt rules and ordinances relating to personnel administration in the mayor, aldermen and civil service commission. The court held that, even if the plaintiff's superiors retaliated against his exercise of First Amendment rights, "it says nothing about the actions of those whom the law established as the makers of municipal policy in matters of personnel administration. The Mayor and Aldermen enacted no ordinance designed to retaliate against respondent or against similarly situated employees. On the contrary, the city established an independent Civil Service Commission and empowered it to review and correct improper personnel actions." (*St. Louis v. Praprotnik, supra,* 485 U.S. 112, 128 (plur. opn. of O'Connor, J.); see also *Feliciano v. City of Cleveland* (6th Cir. 1993) 988 F.2d 649, 654–656 [although chief of police sometimes issued policy statements on drug testing, the final policymaking authority in this area rested in the director of public safety]; *Crowley v. Prince George's County, MD.* (4th Cir. 1989) 890 F.2d 683, 685–686.)

In *Pembaur v. Cincinnati, supra,* 475 U.S. 469, 483 (plur. opn. of Brennan, J.), the court observed that "municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters," but not others. (See also *Davis v. Mason County* (9th Cir. 1991) 927 F.2d 1473, 1480.) Under the facts of *Pembaur,* the court found that a county prosecutor possessed final policymaking authority to direct deputy sheriffs to forcibly enter the plaintiff's clinic to serve two writ capiases. When the plaintiff barred deputy sheriffs from entering his clinic, the deputies requested instruction from their supervisors who referred the issue to the county prosecutor. "The Prosecutor made a considered decision based on his understanding of the law and commanded the officers forcibly to enter

---

[6] Although *Praprotnik* was a plurality decision and *Pembaur* was a plurality decision in part, they were treated as guiding precedents in *Jett v. Dallas Independent School Dist., supra,* 491 U.S. 701, 737 ("the District Court did not have the benefit of our decisions in either *Pembaur* or *Praprotnik* to guide it"). Moreover, *Board of Comm'rs of Bryan Cty. v. Brown, supra,* 520 U.S. 397, 406, relies extensively on *Pembaur* with respect to issues relevant to this appeal.

petitioner's clinic." (*Pembaur v. Cincinnati, supra,* at p. 484 (plur. opn. of Brennan, J.).) The court held: "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy . . . ." (*Pembaur, supra,* at p. 483 (plur. opn. of Brennan, J.).)

A corollary of the *Pembaur* decision is that an official or governing body with authority to make municipal policy may delegate this authority to a particular official with respect to certain matters. (See *Pembaur v. Cincinnati, supra,* 475 U.S. 469, 483 (plur. opn. of Brennan, J.); *St. Louis v. Praprotnik, supra,* 485 U.S. 112, 124 (plur. opn. of O'Connor, J.).) The courts emphasize that the delegation of authority must relate to *policy,* which "generally implies a course of action consciously chosen from among various alternatives . . . ." (*Oklahoma City v. Tuttle, supra,* 471 U.S. 808, 823; see *Doe v. Claiborne County, Tenn.* (6th Cir. 1996) 103 F.3d 495, 507.) Moreover, the policymaking authority must be *final.* (*Abbott v. Village of Winthrop Harbor, supra,* 205 F.3d 976, 981; *Greensboro Prof. Fire Fighters Ass'n v. Greensboro* (4th Cir. 1995) 64 F.3d 962, 965; *Wulf v. City of Wichita* (10th Cir. 1989) 883 F.2d 842, 867–868.) As stated in *Gernetzke v. Kenosha School Dist. No. 1* (7th Cir. 2001) 274 F.3d 464, 468–469, "[t]he question is whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—was at the apex of authority for the action in question. . . . [¶] . . . [T]he cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority."

These precedents make clear that discretionary authority to hire or promote employees does not alone give rise to municipal liability, even though the decision maker may have a final power to make such decisions. (*Gillette v. Delmore* (9th Cir. 1992) 979 F.2d 1342, 1350 ["the discretionary authority to hire and fire employees . . . is not sufficient to establish a basis for municipal liability"].) In a footnote in *Pembaur v. Cincinnati, supra,* 475 U.S. 469, 483 (plur. opn. of Brennan, J.), the court observed: "[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy." (*Id.* at p. 483, fn. 12.) In *Auriemma v. Rice* (7th Cir. 1992) 957 F.2d 397, the court held that the decision of the police chief to demote a group of White officers did not give rise to municipal liability. While recognizing the chief's executive power to make such personnel decisions, the court found that he did not possess the requisite policymaking authority. "Authority to make a final decision," the court held, "need not imply authority to establish rules." (*Id.* at p. 401.) Similarly, in *Greensboro Prof. Fire Fighters Ass'n v. Greensboro, supra,* 64 F.3d 962, where the fire chief was sued for retaliating against union members for the exercise of First Amendment rights, the court held that the

plaintiffs failed to show that he acted pursuant to an official policy. "When a final decision by an employee implements municipal policy, then municipal liability may follow. But if a final decision does not implement municipal policy, or is contrary to it, then it is not imputable to the municipality." (*Greensboro, supra,* at p. 965.)

### 2. *Analysis*

■ The parties advance widely divergent, and equally untenable, arguments for the application of *Monell.* The City seeks to locate final policymaking authority in the civil service commission. This interpretation unquestionably begins with a sound premise: as noted in *Praprotnik* and other decisions, a municipal civil service commission is a common source of policymaking authority in the field of personnel administration. (*St. Louis v. Praprotnik, supra,* 485 U.S. 112, 126 (plur. opn. of O'Connor, J.); *Hyland v. Wonder* (9th Cir. 1997) 117 F.3d 405, 415; *Davis v. Mason County, supra,* 927 F.2d 1473, 1480.) The Charter of the City and County of San Francisco, the most basic source of municipal law (*City and County of San Francisco v. Patterson* (1988) 202 Cal.App.3d 95, 102 [248 Cal.Rptr. 290]), clearly and broadly defines the civil service commission's policymaking power in this area. Charter section 10.101 provides: "The Civil Service Commission shall adopt rules, policies and procedures to carry out the civil service merit system provisions of this charter and . . . such rules shall govern applications; examinations; eligibility; duration of eligible lists; . . . appointments; promotions; . . . the designation and filling of positions, as exempt, temporary, provisional, part-time, seasonal or permanent; . . ."

The City relies on the absence of proof linking Harman's complaint of racial discrimination with policies promulgated by the civil service commission. In particular, the City points out that the diversity staffing plan, which was a focal point of Harman's case at trial, cannot be imputed to the commission. The plan was transmitted to the EEO manager for her review, but it was never approved by the commission or filed with the commission as required by San Francisco Administrative Code section 16.9-24.[7]

---

[7] San Francisco Administrative Code section 16.9-24 provides: "All such plans shall be prepared in consultation with the Civil Service Commission in order to provide technical assistance and recommendations on effective steps to achieve equal employment opportunity. Prior to adoption, the Civil Service Commission shall also approve each equal employment opportunity plan in cooperation with the City Attorney to ensure that compliance is made with all relevant federal, State and local equal opportunity laws or regulations. . . . All such plans shall, upon adoption, be filed with the Civil Service Commission for public or other inspection." The provision is incorporated by reference in San Francisco Civil Service Commission Rules, rule 3, section 3.1.4.

We see little merit in Harman's argument that San Francisco Charter section 4.102(1) gave the Airport plenary power to adopt a diversity staffing plan. This charter provision gives "each

The flaw in the City's argument is that it assumes that, since the civil service commission is a fundamental source of municipal policymaking authority in personnel administration, it is the *exclusive* source of such authority under *Monell*. The argument ignores the possibility that final policymaking authority (a) may exist outside the civil service system or (b) may be effectively delegated to a particular official within the civil service system.

An example of the former is found in *Hyland v. Wonder, supra,* 117 F.3d 405. The plaintiff worked for a while under financial grants and then as a volunteer assisting the chief juvenile probation officer in San Francisco. He was discharged by this official after writing a memorandum critical of the department and filed an action under section 1983 alleging violation of his First Amendment rights. As in the present case, the defendants claimed that final policymaking authority rested in the civil service commission or board of supervisors. The court ruled, however, that he was not an employee and therefore not within the policymaking authority of these bodies. Instead, by a process of delegation, the chief juvenile probation officer possessed final policymaking authority with respect to decisions affecting volunteers, including his discharge.

Similarly, the facts of the present case show an effective delegation of final policymaking authority regarding provisional Airport appointments to a particular official, Dorothy Yee, the EEO manager of the central human resources department.[8] As we have seen, Yee performed a policymaking role in reviewing departmental diversity staffing plans. The Airport's plan did not go beyond her office and was never submitted to the civil service commission. In the case of provisional appointments, Yee reviewed all recommended appointments with respect to the area of policy monitored by her department, i.e., compliance with fair employment practices. Her approval was required for any and all appointments, and she personally signed the personnel action form approving each such appointment. With respect to this category of

appointive board, commission or other unit of government" the power to "[f]ormulate, evaluate and approve goals, objectives, plans and programs and set policies *consistent* with the overall objectives of the City and County, as established by the Mayor and the Board of Supervisors through the adoption of City legislation . . . ." (Italics added.) The word "consistent" recognizes the supervisory powers of the board of supervisors, which it exercised in adopting section 16.9-24 of the San Francisco Administrative Code. Harman's interpretation of this charter provision would lead to an anarchic pattern of autonomous agencies, boards and departments.

[8] Harman maintains that provisional appointments "are not governed by the Civil Service Commission," but the San Francisco Charter clearly places provisional appointments under the authority of the civil service commission. Charter section 10.101, cited *ante,* expressly includes provisional appointments among the personnel decisions under the authority of the civil service commission, and section 10.104 does not list this category of appointments among those that are excluded from the civil service system.

personnel decision, Yee operated as the final arbiter of municipal policy, who interpreted and applied policy according to the standards of her department, and she was effectively at the apex of policymaking authority.[9] The termination of the provisional pool, from which Harman hoped to be promoted, was compelled by the lengthy process of justifying to Yee the appointment of Robert, the last appointment from the pool. Thus, the harm that Harman suffered from his one-year delay in promotion can be traced to the delegated policymaking authority over provisional appointments exercised by Yee as EEO manager.

In contrast, Harman argues that the Airport management itself possessed final policymaking authority over the personnel actions that led to the delay in his promotion. The argument finds scant support in San Francisco municipal law and founders on a mass of evidence produced at trial. The argument for Airport autonomy labors in the face of the undisputed facts that the Airport operated within the civil service system of the City and that Charter section 10.101 confers on the civil service commission the power to adopt "rules, policies, and procedures" governing the civil service system. Plaintiff cites the Charter of the City and County of San Francisco section 4.115[10] and San Francisco Administrative Code section 2A.170,[11] which give the Airport commission a measure of operational autonomy, but these broad grants of operational powers plainly do no take the Airport out of the civil service system or displace the authority of the civil service commission over the administration of all nonexempt employees in the City.

As plaintiff observes, San Francisco Administrative Code section 2A.30 does give department heads decisionmaking authority over temporary appointments,[12] but this provision does not preclude the routine approval of provisional appointments by the central EEO manager, and it clearly cannot be construed as delegating policymaking authority to all department heads.

---

[9] The parties have not elucidated the precise steps in the delegation of authority to the EEO manager. Yee herself testified that she reported to Andrea Gourdine, the director of human resources. In the absence of briefing on the question, we rely on the evidence in the record establishing Yee's final policymaking authority with respect to provisional appointments.

[10] Section 4.115 of the Charter of the City and County of San Francisco provides: "The [Airport] Commission shall have charge of the construction, management, supervision, maintenance, extension, operation, use and control of" the Airport.

[11] Section 2A.170 of the Charter of the City and County of San Francisco provides: "The Airport Commission shall have all the powers and duties in the possession, management, supervision, operation, use, maintenance, extension and control of the San Francisco International Airport and of all other airport properties wherever situated as it may acquire or which may be placed under its control."

[12] Section 2A.30 of the Charter of the City and County of San Francisco provides in pertinent part: "Non-civil service appointments and any temporary appointments in any department or subdivision thereof, and all removals therefrom shall be made by the department head, bureau head or other subdivision head designated as the appointing officer."

Such an interpretation would effectively eliminate the power of municipal government to establish consistent citywide policies.

As the City argues, San Francisco Civil Service Commission Rules, rule 3, section 3.3.1 (Purpose) broadly confers on "any employee" the right to file a complaint of discrimination resulting from "any employment decision made by any agency, department, or commission of the City and County of San Francisco." The procedures governing discrimination complaints thus gave Airport employees the final recourse of an appeal to the civil service commission. (See S.F. Civil Service Com. Rules, rule 3, § 3.6.4(9) [discrimination complaint process].)

The trial record confirms our analysis of the San Francisco Charter and Administrative Code. The Airport's human resources manager, Rafael Centeno, described his department as one of the City's "large decentralized human resources departments," but he made clear that he reported to, and was reviewed by, the central human resources department, and he identified Andrea Gourdine, the City's director of human resources, as his superior. The deputy airport director for administration, Theresa Lee, testified that she communicated with the human resources department of the City "on policy clarification" and that, like all City departments, the Airport has "to comply with" directives of the City's central human resources department. Correspondence between Andrea Gourdine, the City's human resources director and John Martin, the airport director, illustrated the supervisory role of the central human resources department. Gourdine wrote "to reiterate that the Airport must comply with the human resources director's policies and procedures concerning provisional hiring" governing provisional appointments to the 9220 Airport Operations Supervisor position. Martin replied with a lengthy justification of the Airport's actions and assured her that he had "attempted to embrace the letter and the spirit of these policies." As noted earlier, the record abundantly reveals the supervisory role of the City's central human resources department, acting through the EEO manager, in making provisional appointments.

█ Alternatively, plaintiff argues he proved a custom of racial preference that would establish a cause of action under section 1983 in the absence of an official policy. But the standard for proof of a custom under section 1983 is very high: "For purposes of § 1983, a 'custom' is a legal institution that is permanent and established, but is not authorized by written law. [Citation.] Before a custom can be the basis for a civil rights violation, the custom must be 'so permanent and well settled as to constitute a "custom or usage" with the force of law.' " (*Feliciano v. City of Cleveland, supra,* 988 F.2d 649, 655; see *Monell, supra,* 436 U.S. 658, 691; *Doe v. Claiborne County, Tenn., supra,* 103 F.3d 495, 507–508.)

We do not consider that, under this standard, the record contains evidence of a custom of racial discrimination against White males in this job classification. The City had earlier terminated its affirmative action program. The provisional pool for appointment to the position of 9220 Airport Operations Supervisor contained the names of seven White employees, three of whom were promoted to the position, including two male employees. Although a Pacific Islander, Dennis Neves, received the next promotion to the position, the record reveals White males fared well in subsequent appointments to the position. At the time of trial, seven of the eight employees in the 9220 position were White and six of the White employees were male.

■ Our analysis leads to separate conclusions with respect to the two personnel actions at issue—the termination of the provisional pool and the acting appointment. We consider that the EEO manager, Dorothy Yee, exercised an authority over provisional appointments that was closely analogous to the authority that the county prosecutor in *Pembaur* possessed over police practices affecting Fourth Amendment rights. In either case, the official was the final arbiter of municipal policy in a particular, narrow area of municipal administration. We emphasize that the critical consideration under *Monell* is not that Yee had final decisionmaking authority but rather that she effectively formulated and applied municipal policy with respect to provisional appointments. Yee claimed that she was governed by vaguely described policies and rules of the civil service commission and the human resources director, but, as in the case of the county prosecutor, it is unnecessary to identify a precise policy statement, law or custom that governed her decision. She qualifies as a final policy maker under *Pembaur* because she effectively "possess[ed] final authority to establish municipal policy" (*Pembaur v. Cincinnati, supra,* 475 U.S. 469, 481 (plur. opn. of Brennan, J.)) with respect to approval of provisional appointments by making "a considered decision based on [her] understanding of the law . . . ." (*Id.* at p. 484 (plur. opn. of Brennan, J.).)

We reject counsel's suggestion at oral argument that Yee acted as a rogue employee in pushing management to hire minority employees. The delegation of policymaking authority to Yee constituted an established practice in the processing of provisional appointments at the Airport. The record reveals that, as a matter of standard procedure, the Airport referred all provisional appointments for her review and approval with respect to policies bearing on the racial and ethnic composition of the workforce.

The City calls our attention to the broad language in the San Francisco Civil Service Commission Rules, rule 3, section 3.3.1 authorizing employees to complain of any discriminatory decision and ultimately to appeal the decision to the civil service commission. These procedures, it argues, subjected the EEO manager to the oversight of higher authorities in reviewing

provisional appointments. But the complaint procedures offered an illusory remedy to an employee, such as Harman, who might be aggrieved by announcement of a new provisional selection process that effectively eliminated his chance of promotion from an existing provisional pool. There were no rules governing the duration of a provisional pool, and with new hires, transfers and promotions, a pool tended to rapidly lose its value as a representative list of potential candidates for promotion. Under these circumstances, the EEO manager's power to delay an appointment was effectively a power to terminate the pool by allowing it to become unrepresentative. An employee, such as Harman, who hoped to be promoted from an existing pool, could not assert a right to continued use of an existing pool, or complain of a new provisional selection process that eliminated the existing pool, without finding himself in the untenable position of urging use of an increasingly unrepresentative list.

In contrast, we consider that the acting appointment comes within *Praprotnik* and the line of authority holding that discretionary authority to hire, promote or discharge employees is not sufficient to establish a basis for municipal liability under *Monell.* (*Greensboro Prof. Fire Fighters Ass'n v. Greensboro, supra,* 64 F.3d 962, 965; *Gillette v. Delmore, supra,* 979 F.2d 1342, 1350; *Auriemma v. Rice, supra,* 957 F.2d 397, 401.) The evidence discloses that the Airport management exercised final decisionmaking power in making the temporary appointment but it does not establish that the officials participating in the decision—the Airport human resources staff and the supervisors in the operations department—possessed final policymaking authority or implemented a municipal policy or custom causing a constitutional violation. (*Monell, supra,* 436 U.S. 658, 694.) Moreover, unlike the cancellation of the provisional pool, the temporary appointment was an appropriate subject for the grievance procedure that would have required the Airport to justify the appointment under City policy established by the civil service commission. We do not find here the factors that rendered the grievance procedure illusory in the case of the termination of the provisional pool.

### 3. *Instructional Issues*

The City maintains that, even if the evidence satisfied *Monell* with respect to the termination of the provisional pool, the jury's verdict was vitiated by instructional error.

■ The identification of policymaking officials is an inquiry "dependent on an analysis of state law." (*McMillian v. Monroe County* (1997) 520 U.S. 781, 786 [138 L.Ed.2d 1, 117 S.Ct. 1734]; see *St. Louis v. Praprotnik, supra,* 485 U.S. 112, 124 (plur. opn. of O'Connor, J.).) Drawing the necessary

implication from this premise, *Jett v. Dallas Independent School Dist., supra,* 491 U.S. 701, makes clear that the trial court should identify the "officials or governmental bodies who speak with final policymaking authority" (*id.* at p. 737) and instruct the jury that it must determine whether the decisions of these officials or governmental bodies caused the constitutional injury: "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, . . . the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, . . ." (*Ibid.*; see also *Christie v. Iopa* (9th Cir. 1999) 176 F.3d 1231, 1235; *Los Angeles Police Protective League v. Gates* (9th Cir. 1990) 907 F.2d 879, 889–890.)

Consistent with this procedural rule, the City requested the court to instruct the jury that the civil service commission "is the official policy-making body of the City and County of San Francisco with respect to personnel matters." The trial court did not deliver the requested instruction or identify any other policymaking officials or governmental bodies speaking "with final policy-making authority." (*Jett v. Dallas Independent School Dist., supra,* 491 U.S. 701, 737.) The court, however, did instruct the jury that it must find that "an official policy or custom of the City and County of San Francisco was a moving force behind" a constitutional deprivation and offered brief definitions of official policy. In the special verdict, the jury responded affirmatively to the question whether the City has "an official policy or custom to intentionally discriminate against [W]hite males."

In this appeal, the City assigns error only to the failure to identify the final policy maker as required by *Jett.* In general, "instructional error requires reversal only ' "where it seems probable" that the error "prejudicially affected the verdict." ' [Citation.] The reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' [Citation.]" (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203].)

Preliminarily we note that it is material only whether an instruction identifying the policy maker was needed with respect to termination of the

provisional pool. This personnel decision alone is sufficient to support the verdict of damages for Harman's delay in promotion, and plaintiff failed to present evidence that would sustain a verdict based on the acting appointment, the other personnel decision affecting the delayed promotion.

We do not find prejudicial error in the trial court's refusal to give the City's requested instruction locating final policymaking authority in the civil service commission. While this commission is an important source of municipal policy in personnel matters, the pertinent issue regarding the termination of the provisional pool concerned the policymaking authority of the EEO manager, Dorothy Yee. Under *Pembaur* it was not necessary to show that Yee relied on policy promulgated by the civil service commission or other official or governmental body. It is enough to prove that she acted as a final arbiter of policy with respect to this category of appointments.

While the trial court erred in failing to identify the EEO manager as a final policy maker for provisional appointments at the Airport, we consider that the error was not prejudicial to the City. (*Los Angeles Police Protective League v. Gates, supra,* 907 F.2d 879, 890.) The court clearly instructed the jury that it must find an official policy as the moving force of any constitutional violation and the jury explicitly found such an offensive official policy. The identification of the EEO manager as a final policy maker would have facilitated the jury's deliberations in finding this requisite official policy, but we do not think it would have given the City any further line of defense or altered the jury's consideration of the evidence.

We give little weight to the City's argument that the absence of the policy maker identification allowed plaintiff to parade before the jury a document of distinctly secondary importance, the diversity staffing plan. As noted earlier, this plan was relevant evidence of the kind of policy that pervaded the City's personnel administration and thus provided a context for Harman's strongest evidence—Yee's memorandum dated December 17, 1998, recording an intention to push Lamont Foster to choose a minority for the next appointment. The City has not shown that plaintiff's use of the diversity staffing plan misled the jury by presenting an inaccurate or distorted view of policies guiding Yee in her review of provisional appointments.

## C. *Attorney Fees*

### 1. *Legal Overview*

Harman claims the right to attorney fees under the Civil Rights Attorney's Fees Awards Act of 1976, codified in title 42 United States Code section 1988 (hereafter section 1988). The statute provides that in an action to

enforce a provision of designated civil rights statutes, including section 1983, "the court, in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the costs . . . ." "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances. [Citation.] Accordingly, a prevailing plaintiff ' "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." ' [Citations.]" (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 429 [76 L.Ed.2d 40, 103 S.Ct. 1933]; see *Casey v. City of Cabool, Mo.* (8th Cir. 1993) 12 F.3d 799, 805.) As the term "prevailing party" has been construed, the plaintiffs may be considered a "prevailing party" if they " 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' [Citation.]" (*Hensley v. Eckerhart, supra,* at p. 433; see *Texas Teachers Assn. v. Garland School Dist.* (1989) 489 U.S. 782, 791–792 [103 L.Ed.2d 866, 109 S.Ct. 1486].)

The legislative history of section 1988 alludes to the 12 factors set forth in *Johnson v. Georgia Highway Express, Inc.* (5th Cir. 1974) 488 F.2d 714, as appropriate considerations bearing on the reasonableness of the fee. (See also *Kerr v. Screen Extras Guild, Inc.* (9th Cir. 1975) 526 F.2d 67, 69–70.)[13] These 12 factors have continued relevance in guiding judicial discretion, but they have been subsumed by the analysis known as the lodestar method of determining fees. Under this familiar method, "[t]he initial estimate of a reasonable attorney's fee is . . . calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. [Citation.] Adjustments to that fee then may be made as necessary in the particular case." (*Blum v. Stenson* (1984) 465 U.S. 886, 888 [79 L.Ed.2d 891, 104 S.Ct. 1541].)

■ In *Hensley v. Eckerhart, supra,* 461 U.S. 424, the court addressed the issues affecting the determination of the fee "where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." (*Id.* at p. 434.) The court required a two-part analysis: "In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" (*Ibid.*) The court concluded that,

---

[13] As summarized in *Hensley,* the factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." (*Hensley v. Eckerhart, supra,* 461 U.S. 424, 430, fn. 3.)

"where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." (*Id.* at p. 440.)

The court revisited the issue of setting a fee award to reflect partial or limited success in *Riverside v. Rivera* (1986) 477 U.S. 561 [91 L.Ed.2d 466, 106 S.Ct. 2686] (plur. opn. of Brennan, J.) and *Farrar v. Hobby* (1992) 506 U.S. 103 [121 L.Ed.2d 494, 113 S.Ct. 566]. Though *Farrar* concerned the narrow issue of a plaintiff's entitlement to attorney fees based on the recovery of nominal damages, it has been construed by many federal courts as signaling a shift in emphasis in awarding fees under section 1988 that more closely reflects the concurring opinion of Justice Powell in *Riverside*.

In federal courts, awards of attorney fees under section 1988 "are generally reviewed for an abuse of discretion. [Citation.] However, [the courts] only arrive at discretionary review if [they] are satisfied that the correct legal standard was applied and that none of the district court's findings of fact were clearly erroneous. [Citation.] If the parties contend the district court made a legal error in determining the fee award, then *de novo* review is required." (*Thomas v. City of Tacoma* (9th Cir. 2005) 410 F.3d 644, 647; see *Hopwood v. State of Texas* (5th Cir. 2000) 236 F.3d 256, 277; *Morales v. City of San Rafael* (9th Cir. 1996) 96 F.3d 359, 362.)

█ To facilitate the review of judicial discretion, *Hensley* requires the lower court "to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained." (*Hensley v. Eckerhart, supra,* 461 U.S. 424, 437.) Thus, in *Corder v. Brown* (9th Cir. 1994) 25 F.3d 833, 837, the court remanded an attorney fee award where "the district court did not address the limited success issue at all . . . ." Plaintiff argues that California courts do not require a statement of decision with regard to fee awards (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 [104 Cal.Rptr.2d 377, 17 P.3d 735]; *Rebney v. Wells Fargo Bank* (1991) 232 Cal.App.3d 1344, 1349 [284 Cal.Rptr. 113], but in reviewing a federal remedy, it is reasonable to insist on a record adequate to allow a meaningful review of federal standards governing the remedy. (See *Cunningham v. County of Los Angeles* (9th Cir. 1988) 879 F.2d 481, 484; *Phelps v. Hamilton* (10th Cir. 1997) 120 F.3d 1126, 1129.)

### 2. *Unreasonable and Unrelated Charges*

The City presents an array of objections to the effect that the fee award includes charges for legal services having little or no connection to the

modest recovery of damages that Harman ultimately secured. We will briefly review the disputed portions of the award and then consider the legal basis for the City's challenge.

Harman's motions for attorney fees include extensive billings for work in the federal court proceedings. The record shows that, shortly after filing their complaint in the Northern District of California, the three original plaintiffs moved for a preliminary injunction to restrain employment practices at the Airport. The City countered with a motion for the federal court to abstain from exercising jurisdiction over Proposition 209 claims since a major case interpreting the measure, *Hi-Voltage Wire Works, Inc. v. City of San Jose, supra,* 24 Cal.4th 537 was then pending before the California Supreme Court. When the district court ruled for the City on both issues, plaintiffs appealed to the Ninth Circuit Court of Appeals, which issued an inconclusive ruling that caused plaintiffs to file an amended complaint in state court and to abandon the federal proceedings.

In the two posttrial motions, Harman claimed a total of $167,575 for legal services in federal court proceedings. We do not find in the motions any explanation of the relationship between the federal court proceeding and his recovery of damages. Instead, Harman defends the charges by pointing out that the fee requests excised or discounted a substantial portion of the charges in this stage of the proceeding. For example, Attorney Sharon Browne claimed only 50 percent of the hours spent during this stage in the litigation. The City maintains that Harman has failed to show that *any* portion of legal services in this stage of the litigation contributed to his eventual recovery of damages for the one-year delay in promotion.

Prior to issuance of our decision in the prior appeal on April 23, 2003, Harman's claim for damages competed for counsel's attention with the claims of two other plaintiffs and with the ongoing effort to obtain equitable relief. In this appeal, he emphasizes that the motions for attorney fees both omitted services related to Proposition 209, a motion for preliminary injunction, an early demurrer concerning exhaustion of administrative remedies, and certain other matters. The City calculates, however, that Harman seeks compensation for 90 percent of the attorneys' time on discovery in the case and argues that this high percentage necessarily includes much work on the suit for equitable relief and damages claimed by the other two plaintiffs.

More specifically, the City notes that the motions for attorney fees include services in the state court proceedings for a period of over a year between December 1999 and April 18, 2001, before the complaint was amended to state the damage claim on which Harman ultimately prevailed. The motions also include time for discovery proceedings relating to personnel policies

after April 12, 1999, the date that Neves was appointed. Since Harman's delay in promotion was effectively determined by that time, the discovery necessarily related to other failed claims. As an alternative, the City proposes a formulaic reduction in the fee by two-thirds for the period when Harman was one of three plaintiffs and asks that certain travel expenses and duplicative billings be excised from the award.

■ These portions of the award are subject to challenge on two overlapping legal grounds. In either case, our analysis begins with the seminal decision of *Hensley v. Eckerhart, supra,* 461 U.S. 424. The *Hensley* court instructs that the initial lodestar calculation should exclude "hours that were not 'reasonably expended.' " (*Id.* at p. 434.) The Supreme Court then proceeds with an analysis of reasonable charges that draws from an analogy to private billing practices: "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the private sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.' [Citation.]" (*Ibid.*)

We note that "[s]ection 1988 makes the prevailing *party* eligible for a discretionary award of attorney's fees." (*Venegas v. Mitchell* (1990) 495 U.S. 82, 87 [109 L.Ed.2d 74, 110 S.Ct. 1679].) This form of the statute supports the *Hensley* analogy to private billing practices. The analogy, moreover, has been followed in other cases. Thus, *Casey v. City of Cabool, Mo., supra,* 12 F.3d 799, 805, instructs that "counsel for prevailing parties should be paid, as is traditional for attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.' " *Norman v. Housing Authority of City of Montgomery* (11th Cir. 1988) 836 F.2d 1292, 1301, interprets *Hensley* to "mean that the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel." (Italics omitted.)

If questioned charges are included in the initial lodestar calculation, they are then subject to challenge under *Hensley* as being unrelated to the plaintiff's successful claims. As noted earlier, *Hensley* directs the court to consider whether the plaintiff failed "to prevail on claims that were unrelated to the claims on which he succeeded?" (*Hensley v. Eckerhart, supra,* 461 U.S. 424, 434.) Counsel's work on such unsuccessful and unrelated claims "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved['] . . . and therefore no fee may be awarded for services [on such claims]." (*Id.* at p. 435.) The court recognizes that "there is no certain method

of determining when claims are 'related' or 'unrelated,' " (*id.* at p. 437, fn. 12) but it instructs the court to inquire whether the "different claims for relief . . . are based on different facts and legal theories." (*Id.* at p. 434.) If so, they qualify as unrelated claims. Conversely, related claims "will involve a common core of facts or will be based on related legal theories." (*Id.* at p. 435.)

While the courts have sometimes applied the *Hensley* distinction without elaboration (see *Corder v. Gates* (9th Cir. 1991) 947 F.2d 374, 379), we find other authority that attempts to give the distinction greater precision. In *Webb v. Sloan* (9th Cir. 2003) 330 F.3d 1158, 1168, the court emphasizes that the concept of a related *Hensley* claim embraces claims that involve "a common core of facts *or*[, alternatively,] are based on related legal theories." The Seventh Circuit in *Mary Beth G. v. City of Chicago* (7th Cir. 1983) 723 F.2d 1263, followed by a line of Ninth Circuit decisions, suggests that "a useful tool for making this determination is to focus on whether the claims seek relief for essentially the same course of conduct. Under this analysis, an unsuccessful claim will be *un*related to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." (*Id.* at p. 1279; see *Schwarz v. Secretary of Health & Human* (9th Cir. 1995) 73 F.3d 895, 903 [surveying cases]; *O'Neal v. City of Seattle* (9th Cir. 1995) 66 F.3d 1064, 1068–1069; *Odima v. Westin Tucson Hotel* (9th Cir. 1995) 53 F.3d 1484, 1499; *Thorne v. City of El Segundo* (9th Cir. 1986) 802 F.2d 1131, 1141.) In the present case, relief was granted on the basis of the course of conduct of the EEO manager in approving provisional appointments. The *Mary Beth G.* test would focus on whether work expended on the unsuccessful claims was intended to remedy a separate course of conduct.

Other authority inquires whether work performed on the unsuccessful claims "aided the work done on the merits of the [successful claim]." (*Herrington v. County of Sonoma* (9th Cir. 1989) 883 F.2d 739, 747.) The test may lead to a narrow or broad application of the statutory entitlement to fees. In *Perkins v. Cross* (8th Cir. 1984) 728 F.2d 1099, 1100, counsel defended the plaintiffs in a misdemeanor prosecution before bringing suit under section 1983. The court allowed attorney fees for the criminal defense only "to the extent, if any, that research or investigation done in connection with that proceeding proved directly relevant to the successful prosecution of the later civil rights claims . . . ." In contrast, *Cabrales v. County of Los Angeles* (9th Cir. 1991) 935 F.2d 1050 allowed attorney fees in an unsuccessful opposition to a petition for writ of certiorari to the United States Supreme Court. Noting that the plaintiff's judgment was reinstated after remand, the court held: "If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's

fees reasonably expended in pursuing that claim—even though she may have suffered some adverse rulings." (*Id.* at p. 1053.)

### 3. *Limited Success*

The City's principal objections to the attorney fees award pertain to plaintiff's limited success in the litigation. While recognizing the need to avoid double counting (*Cunningham v. County of Los Angeles, supra,* 879 F.2d 481, 487), it relies on the same record that we have reviewed *ante,* arguing that, if hours spent on unsuccessful claims are not excised from the award as unreasonable or unrelated expenses, they should be taken into account in assessing the results obtained in relation to the hours expended.

The City also calls our attention to other portions of the record that relate more directly to the issue of limited success. Plaintiff claims $41,892 for hours expended in opposing the City's motion for summary judgment and $131,382 for work on appeal from the summary judgment. Our previous decision, however, affirmed in most respects the summary judgment in favor of the City, allowing the action to proceed only with respect to Harman's claim of damages under section 1983 for a one-year delay in promotion. The City also maintains that the settlement record is relevant to the issue of plaintiff's degree of success. Approximately one month before trial, the City offered to settle the case for $25,000. Plaintiff rejected the offer and countered with a demand for $600,000 plus attorney fees. The fee award now includes the sum of $247,903 for hours spent at trial, which secured a judgment only $5,000 more than the settlement offer. Finally, the City argues that the ratio of 36 to one between the damages and the attorney fee award is incompatible with recent federal decisions.

Our analysis of governing law again begins with *Hensley* where the Supreme Court noted that the *Johnson* factors for evaluating the reasonableness of an award include consideration of "the amount involved and the results obtained." (*Hensley v. Eckerhart, supra,* 461 U.S. 424, 430, fn. 3.) The trial court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." (*Id.* at p. 435.) The court may appropriately reduce the lodestar calculation "if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." (*Id.* at p. 440.) The decision emphasized, "the most critical factor is the degree of success obtained." (*Id.* at p. 436.)

In *Riverside v. Rivera, supra,* 477 U.S. 561, the appellants challenged an award of attorney fees under section 1988 on the ground that "it was disproportionate to the amount of damages recovered [by plaintiffs]." (477 U.S. at p. 567 (plur. opn. of Brennan, J.).) The case was filed by eight

Chicano individuals who attended a party that was broken up by a large group of police officers. They named as defendants the City of Riverside and 31 individual police officers, alleging that the police officers acted without a warrant, used unnecessary force, and arrested four persons without probable cause. The jury returned a total of 37 verdicts against the city and five individual officers in the total amount of $33,350.

The district court granted attorney fees of $245,456 and supported the award with detailed findings following the remand from an earlier appeal. The district court found that all claims were related and the plaintiffs acted reasonably in naming numerous defendants because of the difficulty in determining which officers did what. The court found that the defendants' unlawful acts were, in many cases, " 'motivated by a general hostility to the Chicano community,' . . . and that [the] litigation therefore served the public interest: [¶] 'The institutional behavior involved here . . . had to be stopped and . . . nothing short of having a lawsuit like this would have stopped it. . . .' [Citation.]" (*Riverside v. Rivera, supra,* 477 U.S. 561, 574 (plur. opn. of Brennan, J.).)

A plurality decision of four justices rejected "the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." (*Riverside v. Rivera, supra,* 477 U.S. 561, 574 (plur. opn. of Brennan, J.).) Concluding that the district court had properly applied *Hensley*, the decision approved its consideration of the public benefit of the suit: "a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms . . . [and] often secures important social benefits that are not reflected in nominal or relatively small damages awards." (*Id.* at p. 574 (plur. opn. of Brennan, J.).)

In a concurring opinion, Justice Powell cited the *Hensley* dictum that " 'the degree of success' " is " 'the most critical factor' " in determining fee awards and expressed the view that "[w]here recovery of private damages is the purpose of a civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought." (*Riverside v. Rivera, supra,* 477 U.S. 561, 585.) He noted that the attorney fees were seven times the amount of the damage award and stated in a footnote that "[i]t probably will be the rare case in which an award of *private damages* can be said to benefit the public interest to an extent that would justify the disproportionality between damages and fees reflected in this case." (*Id.* at p. 586, fn. 3 (conc. opn. of Powell, J.).)

*Farrar v. Hobby, supra,* 506 U.S. 103, arguably lends a degree of authority to Powell's concurring opinion. The issue on appeal was the propriety of

awarding attorney fees under section 1988 where a plaintiff receives only nominal damages. The court held that the plaintiff was technically eligible for an award as a prevailing party but the district court, in the exercise of its discretion, properly declined to award attorney fees: "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief [citation], the only reasonable fee is usually no fee at all." (*Farrar, supra,* at p. 115.)

The *Farrar* holding indirectly supports the consideration of proportionality between damages and the award of attorney fees, and the decision contains language with a similar import. The decision noted that under *Hensley* " 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.' " (*Farrar v. Hobby, supra,* 506 U.S. 103, 114.) Then, giving reasonableness a monetary context, the court quoted the critical language in Justice Powell's concurring opinion in *Riverside* to the effect that a district court must " 'give primary consideration to the amount of damages awarded as compared to the amount sought.' " (*Farrar, supra,* at p. 114.)

In our review of the decisional law, we find that federal decisions after *Farrar* often display a marked restraint in approving attorney fee awards in amounts that constitute a high multiple of damages. This restraint is evident, for example, in *Corder v. Brown, supra,* 25 F.3d 833, 841, where the plaintiff recovered damages of $24,006 against three of a large cast of original defendants. The court remanded an attorney fee award of $240,695 "to reconsider the limited success issue in light of *Farrar.*" In *Migis v. Pearle Vision, Inc.* (5th Cir. 1998) 135 F.3d 1041, 1048, the court observed that an attorney fee award of $81,000 was "over six and one-half times the amount of damages awarded," i.e., $12,233, and this ratio was "simply too large to allow the fee award to stand." In *Dannenberg v. Valadez* (9th Cir. 2003) 338 F.3d 1070, 1071, the plaintiff recovered $9,000 in damages and only part of his desired injunctive relief but was awarded his requested attorney fees of $57,566. Vacating the award, the court held that "the district court did not properly consider [his] degree of success in arriving at a reasonable fee award." (*Id.* at p. 1076.) Again, *Cole v. Wodziak* (7th Cir. 1999) 169 F.3d 486, the court approved the action of the district court in setting an award at $13,336—approximately three times the damages of $4,500. The original fee demand of $85,000 the court regarded as clearly excessive: "A fee 19 times the damages, which plaintiffs sought, is off the map." (*Id.* at p. 488.)

Two decisions offer a certain parallel to the present case in that the plaintiffs vigorously sought equitable relief and recovered only small judgments for damages. In *Gumbhir v. Curators of University of Missouri* (8th Cir. 1998) 157 F.3d 1141, the plaintiff sought "sweeping injunctive relief" for employment discrimination and violation of First Amendment rights in the

workplace and succeeded in recovering $8,846.40 in lost wages and benefits. The court reduced an attorney fee award of $110,000 to $46,750 with the observation: "Gumbhir did not succeed on his claims for institutional equitable relief. He prevailed on only one of his personal damage claims." (*Id.* at p. 1147.) In *Betancourt v. Giuliani* (S.D.N.Y. 2004) 325 F.Supp.2d 330, the plaintiff brought a broad challenge to New York City's policy of removing the homeless from public spaces but recovered only $15,000 for an abusive strip search. The district court cut the requested fee by 90 percent in view of the plaintiff's "minimal success" in changing law enforcement policy and granted an award of $55,976.19. (*Id.* at pp. 334–335.)

The court in *Moriarty v. SVEC* (7th Cir. 2000) 233 F.3d 955, 968, takes a somewhat more liberal position by emphasizing that proportionality is one consideration among others. There the plaintiff was awarded fees of $60,000 for a phase of litigation in which he recovered damages of $2,389. Remanding the fee award, the court stated, "While such disproportionality is not determinative . . . the district court's fee order should evidence increased reflection before awarding attorney's fees that are large multiples of the damages recovered . . . ." (*Ibid.*) Similarly, in *McGinnis v. Kentucky Fried Chicken of California* (9th Cir. 1995) 51 F.3d 805, the plaintiff recovered compensatory damages of $34,000 and punitive damages of $200,000. (*Id.* at p. 807.) After reversing the punitive damages (*id.* at p. 808), the court remanded the case for reconsideration of the attorney fees and costs award of $148,000. The court acknowledged that the plaintiffs may properly recover more than the benefit to their client where "they also confer benefits on others throughout society by winning a civil rights claim. But the benefit is not infinite. What the lawyers do for their actual client is an important measure of 'extent of success.' The district court must reduce the attorneys fees award so that it is commensurate with the extent of the plaintiff's success." (*Id.* at p. 810; see also *Green v. Torres* (2d Cir. 2004) 361 F.3d 96 [with damages of $58,508, the court reduced fee award of $274,485 by a modest 20 percent]; *Larez v. Holcomb* (9th Cir. 1994) 16 F.3d 1513, 1523 [lower damage award should not necessarily lead to a reduced attorney fees award].)

The City draws our attention to authority that the "courts may consider a plaintiff's refusal of a settlement offer as one of several proportionality factors guiding their exercise of discretion . . . ." (*Sheppard v. Riverview Nursing Center, Inc.* (4th Cir. 1996) 88 F.3d 1332, 1337.) We find that the decisional law is by no means consistent on this point. Other authority cautions that " 'a party's declining settlement offers should [not] operate to reduce an otherwise appropriate fee award.' " (*Ortiz v. Regan* (2nd Cir. 1992) 980 F.2d 138, 141; see also *Berkla v. Corel Corp.* (9th Cir. 2002) 302 F.3d 909, 922; *Cooper v. State of Utah* (10th Cir. 1990) 894 F.2d 1169, 1172.) But the record here displays a significant disproportionality between the attorney fee claimed for trial work, i.e., $247,903, and the additional recovery secured by

trial, i.e., $5,000 more than the settlement offer. Under such circumstances, we consider that the trial court may properly consider the settlement offer in evaluating the benefit to plaintiff of the attorney's services at trial. (*Moriarty v. SVEC, supra,* 233 F.3d 955, 967.)

Offsetting the general pattern of restraint, we find other cases citing the public benefit as justifying fees that well exceed the benefit to a private client. In *Morales v. City of San Rafael, supra,* 96 F.3d 359, the plaintiff sought $139,783 in attorney fees in a case where he recovered $17,500 in damages but the district court relied on *Farrar* to set the award at $20,000. Vacating the award, the court remanded the case for a new fee determination recognizing that "[s]uccess is measured not only by the amount of the recovery but also in terms of the significance of the legal issue on which the plaintiff prevailed and the public purpose the litigation served." (*Id.* at p. 365.) As we are reminded by *Norman v. Housing Authority of City of Montgomery, supra,* 836 F.2d 1292, 1302, "[t]he vindication of a constitutional right is important even if only a small amount of money is involved." (See also *Riverside v. Rivera, supra,* 477 U.S. 561, 574 (plur. opn. of Brennan, J.); *Thomas v. City of Tacoma, supra,* 410 F.3d 644, 648 [reversing order denying attorney fees in reliance on *Farrar*]; *Gay Officers Action League v. Puerto Rico* (1st Cir. 2001) 247 F.3d 288, 295 [vindication of First Amendment justifies award]; *Phelps v. Hamilton, supra,* 120 F.3d 1126, 1132–1133 [public interest in invalidation of state statute justifies award]; compare *County of Los Angeles v. Superior Court* (1999) 21 Cal.4th 292, 304 [87 Cal.Rptr.2d 441, 981 P.2d 68], fn. 2; *Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 325 [103 Cal.Rptr.2d 339].)

We note, however, that the public benefit in the case at bar is circumscribed by the scope of the adjudication. Our review of the evidence revealed that Harman succeeded only in challenging the conduct of the EEO manager in approving provisional appointments at the Airport. He cannot reasonably claim a significant public benefit in an alleged institutional impact that exceeds the scope of his proof at trial.

### 4. *Remand*

On the record presented in this appeal, we conclude that the trial court did not properly consider the standards governing the award of attorney fees under section 1988. We remand to give the court an opportunity to consider the determination of a reasonable fee. The court should recalculate the lodestar figures applying the proper standards of reasonableness. Then, it must adjust the fee to reflect plaintiff's limited success by pursuing the two-step analysis dictated by *Hensley*. First, it should exclude hours expended on claims that are unrelated to the claim of damages on which Harman succeeded at trial. Secondly, it must reduce the award to reflect the limited

nature of Harman's relief in comparison with the scope of the litigation as a whole. As instructed by *Hensley*, the court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." (*Hensley v. Eckerhart, supra*, 461 U.S. 424, 436–437.) When it recalculates the attorney fee award, the court must articulate a clear explanation of its reasoning in light of the authority surveyed in this opinion so as to facilitate meaningful appellate review. We express no opinion as to the amount of fees that the court should award. That amount is left to the trial court's sound discretion to be exercised in view of the governing standards we have set forth.

## DISPOSITION

The judgment for damages is affirmed. The award of attorney fees is vacated and the case remanded for further proceedings consistent with this opinion. Each party shall bear its costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied March 21, 2006.